**BEAR BRAND HOSIERY COMPANY,**
Appellant,

v.

**TIGHTS, INC., Appellee.**

**No. 78–1116.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 4, 1978.

Decided Sept. 5, 1979.

Karl N. Hill, Greensboro, N. C. (William B. Rector, Jr., Jordan, Wright, Nichols, Caffrey & Hill, Greensboro, N. C., on brief), for appellant.

Frank J. Sizemore, III, Greensboro, N. C. (Jack W. Floyd, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and BUTZNER, Circuit Judge.

HAYNSWORTH, Chief Judge:

In this contract case within our diversity jurisdiction, the district court held that, after proper termination of the contract of indefinite duration, the terminating party had no obligation with respect to monies collected after the termination date but due and accrued before. He granted summary judgment, relying principally upon a provision that such payments were to be made with respect to collections each month by the tenth of each succeeding month. We think that, at the least, the contract is reasonably susceptible to a different construction and reverse.

## I.

The plaintiff, Bear Brand Hosiery Company, is a manufacturer of women's hosiery. It had developed technology in that field and an effective quality control program. The defendant, Tights, Inc., is a licenser of patents and technology in the hosiery business. It also seeks to control the quality of goods manufactured by its licensees.

In 1970 Tights and Bear Brand executed two agreements. Under the first contract, Tights, for substantial consideration, licensed to Bear Brand its "Rice Patent" for use in the production of seamless panty hose. Under the second agreement, Bear Brand assigned to Tights all of its "inventions, patent applications, . . . patent rights, [and] technical know-how, related to the production of seamless panty hose or tights." Bear Brand agreed to use its best efforts to persuade other manufacturers to become Tights' licensees, to assist Tights in developing and enforcing its quality control program and to share its training materials with Tights. In return, Tights agreed to pay Bear Brand 12.5 percent of "the gross royalty collected in the future" under Tights' licensing program, including royalties collected from Bear Brand. Tights also

agreed to pay to Bear Brand 30 percent of the gross royalty collected in the future on licenses of patents assigned by Bear Brand to Tights. Section 6 of the contract provided that the payments by Tights to Bear Brand "shall be made on or before the tenth day of each calendar month for collections made by Tights during the preceding month . . . ." In Section 8 there was a provision for termination upon ninety days' notice by either party. Upon termination, Bear Brand was given certain options about the reacquisition or use of its patents and patent rights, but, with that exception, the contract provided that the party giving the notice of termination would be relieved of all further duties under this agreement upon the effective date of termination.

In the years that followed, a number of hosiery manufacturers used the disclosure of the Rice Patent without becoming licensees of Tights. Tights brought numerous patent infringement actions against such manufacturers, who contested the validity of the patent. In 1976 this court affirmed a judgment upholding the patent. *Tights, Inc. v. Acme-McCrary*, 541 F.2d 1047 (4th Cir. 1976). The Rice Patent had expired in March of 1975. With the holding of patent validity, however, Tights was left with very substantial claims against the infringers.

In September 1976, Tights collected $465,-649.69 from some of the infringers. In that sum there were increments of interest and court costs, but there were $379,820.36 which had been computed at the rate of 2 cents per dozen on the sales of the settling infringers.

In October, Tights reported these collections to Bear Brand. It thought that Bear Brand was due nothing out of the receipts of interest and court costs, and it attempted to draw a distinction between the receipts of royalties from licensees and the receipt of the $379,820.36 in settlement of its infringement claims. However, while stating that Tights did not feel that Bear Brand was entitled to any portion of the September collection, it tendered a check in an amount computed on the basis of 12.5 percent of $379,820.36.

In a subsequent exchange of letters, Tights confirmed Bear Brand's expectation that it would receive similar monthly payments in the future, but limited its stated obligation to the time within which the agreement remained in effect. It stated that no one intended to modify the provision providing for termination at will upon ninety days written notice.

On October 28, 1976, Tights gave written notice of termination of the contract. The termination took effect on January 31, 1977.

Tights paid Bear Brand 12.5 percent of all sums received before January 31, 1977 in settlement of the infringement claims, less interest and court costs. It refused, however, payment of anything to Bear Brand with respect to any receipts upon its infringement claims collected thereafter.

Bear Brand brought this action seeking a declaratory judgment that Tights was required by the contract to share its subsequent infringement claims collections with Bear Brand, since the collections were constructive royalties fully accrued while the contract was in full effect. As noted at the outset, however, summary judgment was awarded to Tights on the basis of the termination and payment-collection clauses.

## II.

Summary judgment could properly have been entered in favor of Tights only if the contract unambiguously permits Tights to retain all royalties collected after, though accrued before, the effective termination date, without payment of 12.5 percent to Bear Brand.

We hold that it does not.

No one questions the right of Tights to terminate the contract as it did or the effectiveness as of January 31, 1977 of its exercise of that right. What is involved is the consequence of that termination in the context of sums fully due and payable to Tights long before the termination date but uncollected until thereafter.

When the validity of the patent was finally upheld, Tights had obtained an en-

titlement to damages from all infringers of its patent. As characterized by Bear Brand, a right to damages had "vested" and constructive royalties had "accrued."

Settlement negotiations and continuing litigation delayed collection of some of these sums until after January 31, 1977.

■ In considering the propriety of summary judgment in a contract case, the court may not look beyond the four corners of the document. Only an unambiguous writing justified summary judgment, and no writing is unambiguous if "susceptible of two reasonable interpretations." *American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965). *See Cram v. Sun Ins. Office, Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967); 10 C. Wright & A. Miller, Federal Practice & Procedure, § 2730, at 584–87 (1973). This accords with the principle that the intention of the contracting parties is a question of fact. If there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact.

Tights, of course, relies upon Section 6 and Section 8 of the contract. Section 6 obligated Tights to pay to Bear Brand 12.5 percent of royalties collected. It contained a provision that payment should be made to Bear Brand on or before the tenth day of each calendar month for collections by Tights during the preceding month. Coupled with the provision for termination at will upon ninety days written notice, Tights contends that the contract unambiguously imposes upon it no obligation of payment to Bear Brand with respect to any sums collected after January 31, 1977.

We need not consider whether that construction of the contract by Tights is impermissible, for we find the contract readily susceptible of another reasonable reading.

It seems obvious that the parties intended to relate the timing of payments by Tights to Bear Brand to collections by Tights. If a licensee was slow in remitting accrued royalties to Tights, Tights would not wish to be obligated to divert other of its quick assets to an immediate payment to Bear Brand. Obligors sometimes are slow in payment, and some of them sometimes go bankrupt. Moreover, it surely was foreseeable that there might be infringements of the patent resulting in prolonged litigation of uncertain outcome. In neither of those situations would Tights wish to be obligated to make current payments to Bear Brand on the basis of assumed accruals, and fairness would not permit Bear Brand to demand it. Thus viewed, Section 6's casting of the payment obligation to Bear Brand in terms of sums collected or paid may well have been only a housekeeping measure relating to the timing of the mandated payments. Under this view as rights to royalties accrued to Tights, an immediate duty arose on the part of Tights to pay over to Bear Brand 12.5 percent of those royalties when collected.

The termination clause relieved Tights of "further duties" after the effective termination, but clearly those further duties would not include a duty of payment to Bear Brand with respect to royalties actually collected before the termination date. With respect to sums collected in January 1977, payment to Bear Brand was not due until February, after the effective termination of the contract, but surely such payment in February was not a further duty of which Tights was relieved. Similarly, such further duties need not include the duty of payment to Bear Brand with respect to royalties fully accrued before termination, though actually collected thereafter.

Finally, Tights suggests that symmetrical application of the termination provision supports the judgment in its favor since the contract gives Bear Brand the right to withdraw its assignment of its patents to Tights. While symmetry of application and the predictability of attempts to strike fair and equally advantageous bargains are lights along the way in the search for contractual intent, our purpose is far more circumscribed here. What is symmetrical is a complex question. It could be argued that the ability of Bear Brand to terminate the assigned rights of Tights in ninety days is matched by the right of Tights to retain

all royalties accruing more than ninety days after giving the termination notice. Moreover, the search for symmetry here is rendered even less manageable by the complex exchange relationship created by these contracts. But it is not the province of appellate courts, or of the trial courts ruling on summary judgment motions, to measure such imponderables. That is a task for the fact finder who may consider, along with many other factors, the symmetry and fairness of any suggested interpretation of the contract.

A wooden and inflexible construction of the words "paid" and "collected" should give way when it flies in the face of basic fairness and common sense. Such a construction would produce extraordinary results under other, but plausible, circumstances. Under the contract, Bear Brand was to use its best efforts to persuade other manufacturers to obtain licenses from Tights under the Rice Patent. If it produced a dozen such manufacturers and Tights entered into a license agreement with each providing that no royalty payment would be due until one hundred days after royalties first began to accrue and Tights then gave the ninety day notice of termination, Bear Brand would be deprived of all benefit of its effort under the district court's construction of the contract. Tights had the right to cut off its obligations with respect to accruals after the effective termination date, but it is doubted that one would seriously argue that Tights had the right to cut off such rights simply by an extraordinary postponement of the date for collection of accrued royalties. But if Tights is right in the construction it would have us adopt here, the same construction would lead to the assumed result in the hypothetical case.

On this record, there is no basis for supposing that Tights was not diligent in its effort to collect monies from the infringers, but surely the time of collection was substantially influenced by the effectiveness of those efforts, and the duty of payment by Tights to Bear Brand ought not to be referable to the possible ineffectiveness of its own collection efforts.

Tights contends that Bear Brand proposed the termination clause, in consequence of which it should be construed against Bear Brand. The principle articulated, however, is but one of a number of rules of thumb useful in reaching a conclusion about contractual intent when there are two or more reasonable constructions of the contractual language. The principle is wholly irrelevant in the threshold question before us on summary judgment, which is whether the construction urged upon us by Tights is the only reasonable construction available.

█ Tights also contends that even if Bear Brand's construction of the contract is adopted, no right to royalties had accrued to Tights when the judgment upholding the validity of its patent became final or, later, before actual collection or the rendition of a judgment. It is true that there were no readily ascertainable funds to which Tights could lay claim, but, armed with its judgment of patent validity, it was assured of a right to collect damages in the nature of constructive royalties from each of the infringers. But the amounts were uncertain. This is true in the sense that, at that time, Tights probably had little precise information about the volume of sales of the infringers. It is also true in the sense that the rate at which constructive royalties would be computed was an open question. The royalty rate for licensees had fallen to two cents per dozen, but in *Tights, Inc. v. Kayser-Roth Corp.,* 442 F.Supp. 159 (M.D.N.C.1977), decided more than five months after the effective termination date, the court recognized that the wide infringement had substantially depressed the amount which licensees could afford to pay in royalties. The recovery from Kayser-Roth of over $2,700,000 in royalties, before interest and costs, was calculated on the basis of 12 cents per dozen. Thus, before the effective date of the contract termination, Tights knew that it had a right to recover a substantial sum from Kayser-Roth, but had no means of determining with any precision how much. If the monetary dimension of the right had not been determined, how-

ever, the right had accrued much earlier before the patent's expiration in 1975. It may be that the fact finder may have for determination the question whether these claims were sufficiently accrued to uphold Bear Brand's claims under its construction of the contract, but at this stage such uncertainty as to the amounts which ultimately would be collected does not foreclose consideration of Bear Brand's contract interpretation contention.

■ Though it was uncertain as to the amount of ultimate recovery, the accrued right of action was a property right with respect to which the parties were free to enter into contractual arrangements. The only question is whether that was their intention.

### III.

■ For the first time at oral argument in this court, Tights advanced a theory of contract modification out of the exchange of correspondence in October 1976. On October 8, Tights wrote of its September collections and its proposal to share the gross damage recovery with Bear Brand, but not the interest or court costs. In responding on October 14, Bear Brand explicitly agreed with this. This seems a reasonably fair result for, though Bear Brand had been delayed in receiving its money, just as Tights had been, Tights had borne the burden of the expenses of litigation. In accepting that proposal, however, Bear Brand mentioned its expectancy of continuing receipt of such payments in the months to come, which provoked the letter from Tights of October 21 stating, in effect, that such payments would continue during the life of the contract but that neither party intended a change in the termination provisions. Bear Brand did not respond to that letter, perhaps because the termination notice came only one week later, and the controversy was on. In any event, however, under these circumstances, the short silence of Bear Brand after receipt of the October 14 letter would not constitute an acceptance of any contract modification proposal. *Nationwide Mutual Insurance*

*Co. v. Shantos,* 238 S.E.2d 597, 603 (N.C. 1977). Only in unusual circumstances may an acceptance be inferred from silence. *See* Restatement of Contracts, § 72; Williston on Contracts, § 91, *and see e. g. T. C. May Co. v. Menzies Shoe Co.,* 184 N.C. 150, 113 S.E. 593 (1922).

Bear Brand also offers a contract modification argument.

In 1973 Tights needed cash to support its ongoing litigation. It sought and obtained from Bear Brand a payment of $25,000 which Bear Brand would have been required to pay several months later. Tights assured Bear Brand that its conduct of the litigation was for the benefit of Bear Brand, as well as Tights, and that the substantial recoveries expected would inure to the benefit of Bear Brand as well as of Tights. Probably this assurance to Bear Brand is only "a hopeful encouragement, sounding only in prophecy" and not a legally binding promise, *Hall v. First National Bank of Chelsea,* 173 Mass. 16, 53 N.E. 154, 155 (1899). We do not undertake to decide the question, however. The contention was discussed in the district court, but the only question before us is the appropriateness of summary judgment in favor of Tights, not of summary judgment in favor of Bear Brand. After any necessary amendment of pleadings, however, the contention should be open for reconsideration in the district court in light of all the other evidence which may be produced at trial.

■ Whether or not any formal contract modification is established, evidence of the course of dealing and of exchanges between the parties during contract performance, along with other evidence, will be relevant in a determination of the initial contractual intent.

Since we find a substantial issue of fact to be present, the summary judgment in favor of Tights is vacated and the case remanded for a trial.

*VACATED AND REMANDED.*