**AUDIO FIDELITY CORPORATION, Appellee,**

v.

**PENSION BENEFIT GUARANTY CORPORATION, Appellant.**

**No. 79–1262.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1980.

Decided July 2, 1980.

---

David R. Levin, Washington, D. C. (Henry Rose, General Counsel, Mitchell L. Strickler, Deputy Gen. Counsel, James N. Dulcan, Asst. Gen. Counsel, Washington, D. C., on brief), for appellant.

James W. Treadway, III, Richmond, Va. (Michael L. Soffin, Delman H. Eure, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

Pension Benefit Guaranty Corporation, a federal corporation established under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1302, pursues this appeal on behalf of 11 participants in a benefit pension plan sponsored by Audio Fidelity Corporation. After consideration of the stipulated facts and an evidentiary hearing, the district court held that Audio, the employer, was entitled to excess funds in the plan after its termination. We reverse.

I

Audio instituted a benefit pension plan on July 1, 1966, to provide employees, meeting age and service requirements, with monthly benefits upon retirement.[1] The plan provided for the purchase of individual insurance contracts for the participants and for an auxiliary fund.[2] It required Audio to pay to the trustees or its insurance carrier, Equitable Life Assurance Company, sufficient funds to finance the plan.[3] Audio's annual contribution was determined by the insurance carrier. The plan qualified for favorable tax treatment from its inception under 26 U.S.C. § 401, and it was amended in 1975 to comply with ERISA requirements.

The plan became financially burdensome, so Audio terminated it on June 30, 1976. A subsequent audit disclosed that its assets exceeded the value of the participants' accrued pension benefits under Article IV by approximately $43,000. Section 11.2 is the critical provision of the plan governing disbursement of its assets upon termination. It provides:

Upon such termination, the Trustees shall transfer to each Participant, by suit-

---

1. Article IV of the plan provides in part:

   4.1 The normal retirement benefit to be provided for every Participant shall be a monthly pension commencing on his Normal Retirement Date and continuing for life. In the event of the death of the Participant prior to completion of one hundred twenty (120) monthly payments, such monthly payments shall be continued to the Participant's designated Beneficiary until the monthly payments made to the Participant and to such Beneficiary shall total one hundred twenty (120).

2. Article II of the plan defines "auxiliary fund" as follows: "A fund established for the purpose of purchasing additional annuities at retirement to provide the retirement benefits."

3. Section 6.1 provides:

   The Employer shall pay over to the Trustees from time to time such sums of money as the Trustees shall certify to the Employer to be necessary to provide the benefits specified herein. Payment of such sums of money may be made to the Trustees or directly to the Insurance Company issuing contracts hereunder. In addition, the Employer shall pay over to the Trustees from time to time the sums required, computed on such assumptions as the Trustees shall deem appropriate, to be deposited in the Auxiliary Fund for the purpose of purchasing any additional annuity permitted under the terms of the Contracts and the rules of the insurance company.

   Section 5.2 provides:

   On and after the effective date of this amendment, the Trustees shall use the funds of the Trust from time to time (1) to purchase Contracts on the lives of Participants issued by Equitable Life Assurance Society of the United States and (2) to make deposits into the Auxiliary Fund.

able instrument of transfer and delivery thereof, all Contracts for his benefit then in the Trustees' possession, together with an amount equal to the amount received by the Trustees because of the change in the form of insurance policies, if any, as provided for in this Amendment and thereafter the Trustees shall have no further right, title or interest in and to such Contracts. *Any funds or other assets held by the Trustees or subsequently reverting to the Trustees from the Auxiliary Fund shall, after deducting estimated expenses for distribution thereof, be distributed among the Participants in an equitable manner.* (Emphasis added)

This section is complemented by § 18.4 which prohibits diverting any part of the corpus or income of the trust to purposes other than for the "exclusive benefit" of participants.

After receipt of the audit, Audio amended the plan. The amendment was made seven months after its termination, retroactive to the date of termination. The amendment was designed to authorize the trustees to pay Audio the remaining assets by providing:

> Article 11.2 is deleted and the following substituted in lieu thereof:
>
> 11.2—Upon such termination, the Participants' rights under the Trust shall be fully vested and such vested interest shall be converted to cash and paid to or for the benefit of the Participants.
>
> 11.3—No funds or other assets held or received by the Trustees shall be used for any purpose other than the exclusive benefit of the Participants prior to the satisfaction of all liabilities to such Participants as provided in Article 11.2. Upon the satisfaction of all liabilities to such Participants, any remaining assets of the Trust shall be repaid to the Employer.
>
> 18.4—No part of the corpus or income hereunder shall ever be used or diverted to purposes other than for the exclusive benefit of Participants, Retirement Participants, and Terminated Participants, or their Beneficiaries prior to the satisfaction of all liabilities to such persons.

Pension Benefit disapproved the proposed distribution of any of the fund's assets to Audio. Audio then brought this action seeking a declaratory judgment validating the distribution. Pension Benefit filed a counterclaim asking for distribution of all the assets to the participants.

The district court found for Audio on three grounds. First, it considered the excess payments to the plan to have been a mistake based on "actuarial error." Further, the district court accepted the amendment as valid. It held that since the excess funds were paid by mistake, the amendment would have no effect on benefits properly accrued to the participants. Alternatively, the court ruled that if the amendment were not valid, it could reform the plan to provide for the terms of the amendment. Finally, the court found that the distribution of excess funds would unjustly enrich the participants at the expense of Audio because the plan fully compensated the employees by paying them the value of their accrued benefits as set forth in Article IV.

## II

Audio's pension plan must comply with the statutory requirements of ERISA. Title 29 U.S.C. § 1103(c)(1) provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants . . . ." The only relevant exception to this mandate is § 1344(d)(1) on which Audio relies. In plans which are fully funded, the employer is entitled to "residual assets" if "the plan provides for such a distribution" without contravening any law. Audio sought to conform the pension plan to this exception by its amendment after termination arguing that ERISA has no prohibition against retroactive amendments. Quoting § 10.2 of the plan, Audio asserts that it may amend the plan "at any time to any extent it may deem advisable" so long as it does not interfere with the participants' accrued benefits under Article IV.

■ Contrary to Audio's interpretation, § 10.2 does not allow any amendment to the plan at the employer's will. Indeed, the power to amend which Audio seeks to exercise is limited by the prefatory clause, "Except as herein limited . . . ." Pertinent limitations are set forth in § 10.2 subsections (b), "no amendment shall have the effect of vesting in the Employer any interest in or control over any Contracts . . or any other property subject to the terms of this Trust," and (d), "no amendment shall have the effect of depriving any then Terminated Participant of the benefits to which he is entitled under this Trust." Audio therefore had no authority by the terms of the plan to recapture through retroactive amendment funds that it had dedicated to the trust. As we have previously noted, § 11.2, before its amendment, specifically provided that upon termination such funds would be distributed equitably among the participants.

■ Furthermore, ERISA afforded Audio no basis for altering the substantive terms of the plan after its termination. Even though the money was held in trust and the trust continued after the contributions ended, authority to vary the participants' interests ended on June 30, 1976. *In re Del Chemical Corp.*, No. 79–C–250 (E.D. Wis.1979). On the date of termination, Audio no longer was obligated to make contributions, and the participants no longer were entitled to accrue additional benefits. The rights of both parties became fixed, and substantive modifications to the plan altering these rights were precluded. *Cf. Rochester Corp. v. Rochester*, 450 F.2d 118, 120–22 (4th Cir. 1971). The scheme established by ERISA relies upon the provisions of each plan at the time of termination. It would defeat congressional intent and render §§ 1103(c)(1) and 1344(d)(1) nugatory if retroactive amendments after termination could alter substantive rights of the pension plan.

Audio's reliance on *In re C. D. Moyer Co. Trust Fund*, 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd. without opinion*, 582 F.2d 1273 (3d Cir. 1978), is misplaced. There an amendment providing for the employer's recoupment of excess funds was made before termination. Moreover, the *Moyer* court found: "[The plan's] elaborate scheme of priorities in the event of revocation or termination . . . makes no provision for the allocation of any remaining funds after all the obligations to the participants have been fulfilled." From this the court concluded: "A reading of the Plan as a whole convinces me that the parties did not contemplate that at the time of termination there would be an excess due to overfunding." 441 F.Supp. at 1132. In contrast, the Audio plan provides for the creation of an auxiliary fund "for the purpose of purchasing additional annuities at retirement to provide the retirement benefits." Also, unlike the *Moyer* plan, the Audio plan expressly provides for the distribution of assets among the participants upon termination. *Moyer*, consequently, does not sustain Audio's position.

### III

Alternatively, Audio seeks affirmance of the district court's reformation of the plan on the grounds of mistake and unjust enrichment. It relies on the testimony of its president to the effect that "Audio did not intend, nor contemplate, making payments in excess of what was required" to fund the pensions described in Article IV. Pension Benefit objected to the admission of this testimony because it violated the parol evidence rule. Audio, in response, relies on the principle that a court of equity may reform a contract which because of a mistake does not conform to the intent of the parties.

■ We conclude that Pension Benefit's objection to the admissibility of this evidence was sound. The plan was a contract between Audio and its employees. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Its terms are clear and unambiguous. In addition to the purchase of the Article IV pensions, it provided for an auxiliary fund and for the distribution upon termination of all funds and assets to the

participants in addition to their pension contracts. Oral testimony is inadmissible to vary its unambiguous written terms. *Rock-Ola Mfg. Corp. v. Wertz*, 282 F.2d 208 (4th Cir. 1960). Of course, as Audio points out, a court of equity can reform a contract to correct a mistake disclosed by oral proof. But the mistake must be mutual, or if unilateral, it must be accompanied by fraud on the part of the other contracting party. *Grayson v. Buchanan*, 88 Va. 251, 13 S.E. 457, 458 (1891). *See* 4 Williston on Contracts § 631 (3d ed. 1961). Audio has satisfied neither of these requirements.

█ Audio's claim that its employees would be unjustly enriched by receiving their equitable share of the fund's assets is foreclosed by *Rochester Corp. v. Rochester*, 450 F.2d 118, 121 (4th Cir. 1971). There, referring to a pension plan, Judge Russell wrote:

> By rendering service for the period required under the plan, the employee's rights to benefits under the plan are "earned no less than the salary paid to him (the employee) each pay period" and are "in the nature of delayed compensation for former years of faithful service." Whether the plan be contributory or noncontributory, the benefits, thus earned, are not gratuities.

The evidence disclosed that Audio's plan was available for inspection by the participants. Some, in fact, examined it. Examination would reveal that in return for their services participants were entitled on termination of the plan not only to the pensions purchased for their benefit but also to their ratable share of the plan's assets after the payment of expenses. Payment of these sums will not unjustly enrich the participants. It will simply discharge Audio's contractual obligation for which the participants have rendered service.

The judgment of the district court is reversed, and the case is remanded for entry of a decree consistent with this opinion.