819 F.2d 457
 55 USLW 2691, 8 Employee Benefits Ca 1809
 David W. WILSON, on behalf of himself and all others
similarly situated; George J. Mabe, on behalf of
himself and all others similarly
situated; Rolla H. Frasher,
Plaintiffs-Appellants,
v.
BLUEFIELD SUPPLY COMPANY; B.W. Harvey; James E.
Gillenwater; Mirto A. Corte; C.I. Johnson, Jr.;
Robert M. Richardson; A.A. Modena,
Defendants- Appellees,
and
Flat Top National Bank, Defendant.
 No. 87-3501.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 3, 1987.
Decided May 26, 1987.
Rehearing and Rehearing En Banc Denied Aug. 7, 1987.
 
 Carl Alan Genberg, Columbus, Ohio, (Freeman T. Eagleson, Columbus, Ohio, John L. Hash, Thomas L. Clark, Lexington, Ky., on the brief) for plaintiffs-appellants.
 Anne Gordon Greever (Jennings G. Ritter, II, Hunton & Williams, Richmond, Va., on the brief) for defendants-appellees.
 Before HALL, and WILKINS, Circuit Judges, and TIMBERS, Senior Circuit Judge for the Second Circuit, sitting by designation.
 TIMBERS, Circuit Judge:
 
 
 1
 Appellants David Wilson and others ("appellants") are a plaintiff class consisting of all employees, or their surviving spouses or estates, of appellee Bluefield Supply Company ("Bluefield"), or its affiliated companies, with vested rights in a pension plan established by Bluefield.
 
 
 2
 Appellants appeal from a judgment entered December 17, 1986 in the Southern District of West Virginia, Elizabeth V. Hallanan, District Judge, 650 F. Supp. 578, which granted summary judgment in favor of appellees Bluefield and others (collectively "appellees"), and denied summary judgment sought by appellants. The cross motions for summary judgment involved appellants' claim for breach of fiduciary duty under Sections 404 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Secs. 1104, 1132 (1982), and appellants' related breach of contract claim.
 
 
 3
 Bluefield established its pension Plan in 1951 ("the 1951 Plan" or "the Plan"). The Plan provided that Bluefield could amend it under certain conditions; it also provided that the assets in the pension fund were for the exclusive benefit of the employees and could not be withdrawn "either by the voluntary act of the Company or ... otherwise". It did not provide expressly that Bluefield could recover the Plan's "residual assets" in the event the Plan was terminated. "Residual assets" are those assets remaining in a pension plan at the time of termination after payment to the employees of all accrued benefits under the plan.
 
 
 4
 In 1973, the Plan was amended to provide expressly that any residual assets would be distributed to Bluefield if the Plan was terminated ("the residual assets amendment"). The Plan was amended in other respects referred to below.
 
 
 5
 Bluefield terminated the Plan in 1985. After satisfaction of all accrued benefits, the Plan had $14.5 million in residual assets.
 
 
 6
 Appellants then commenced the instant action. They sought distribution to them, rather than to Bluefield, of the residual assets. Appellants relied on an ERISA provision that residual assets can be distributed to the employer only if "the [pension] plan provides for such a distribution". 29 U.S.C. Sec. 1344(d)(1)(C) (1982). They claimed that the Plan as it existed in 1951 barred the residual assets amendment, since the latter constituted an "act of the Company" resulting in withdrawal of the pension fund's assets.
 
 
 7
 Appellants and appellees filed cross motions for summary judgment. The district court granted appellees' motion and denied appellants' motion in a well reasoned opinion recognizing the narrow issue to be whether the residual assets amendment contravened the provisions of the Plan as it existed in 1951.
 
 
 8
 On appeal from the judgment entered on the opinion of the district court, appellants claim, first, that the court erred in granting appellees' motion for summary judgment and in denying their own motion for the same relief since the Plan as it existed in 1951 unambiguously barred the residual assets amendment; and, second, that the court erred in disposing of the action by summary judgment since there was a genuine issue of material fact as to whether the Plan as it existed in 1951 barred the residual assets amendment.
 
 
 9
 We hold, first, that the 1951 Plan, when read as a whole, did not bar the residual assets amendment and therefore that Bluefield is entitled to the residual assets; and, second, that the district court correctly disposed of the action by summary judgment, since the 1951 Plan, read as a whole, was not ambiguous and thus there was no genuine issue as to any material fact.
 
 I.
 
 10
 We summarize only those facts believed necessary to an understanding of the issues raised on appeal.
 
 
 11
 Bluefield is a Virginia corporation with its principal place of business in Bluefield, West Virginia. Through its affiliated companies, Bluefield sells, leases, and services equipment for use in construction, mining, and other industries.
 
 
 12
 In a "Pension Trust Agreement" dated January 4, 1951, Bluefield established a defined benefit pension Plan for the benefit of eligible employees ("the participants"). As a defined benefit plan, the Bluefield Plan was designed and administered to provide fixed--or "defined"--benefits to the participants based on a benefit formula set forth in the Plan. The benefit formula was based on each participant's compensation and period of covered employment with Bluefield. Benefits under the Plan accrued during each participant's period of covered employment and in general were payable in monthly installments beginning when the participant retired.
 
 
 13
 Bluefield, including its affiliated companies, was the sole contributor to the Plan; the participants made no contributions. The amount of Bluefield's annual contribution to the Plan varied according to actuarial predictions. Those predictions took into account assumptions by an actuary regarding such variables as employee compensation, employee turnover, investment returns, and mortality. The purpose of the actuarial predictions was to ensure that the Plan had sufficient funding to satisfy benefit obligations as they became due.
 
 
 14
 Bluefield bore the risk of the Plan's "actual experience". For example, if the investment yield of the Plan's assets in any particular year was less than the yield assumed by the actuary when he calculated the amount of Bluefield's contribution for that year, then Bluefield might have been required to make an additional contribution or a larger contribution the following year. Conversely, if the investment yield in a particular year exceeded the yield assumed or predicted by the actuary, then Bluefield might have been permitted to make a smaller contribution the following year. In either event, participants' benefits would not have been affected.
 
 
 15
 Beginning in 1952, the Plan was amended several times. Some amendments increased benefits to the participants. Some of the others reflected changes either in the applicable tax laws and regulations or, later, in ERISA, which Congress enacted in 1974. Pub.L. No. 93-406, 88 Stat. 832 (codified as amended at 29 U.S.C. Secs. 1001 to 1461 (1982 & Supp. III 1985). None of the amendments altered the Plan's status as a defined benefit plan. See 29 U.S.C. Sec. 1002(35) (1982) (defining "defined benefit plan").
 
 
 16
 In 1973, the Plan was amended to provide expressly for the first time that Bluefield would receive any residual assets in the event that the Plan was terminated. The Plan was amended again in 1976. As the result of the 1973 and 1976 amendments, the Plan expressly provided for Bluefield's right to recover residual assets by virtue of the residual assets amendment:
 
 
 17
 "If following a complete or partial termination of the Plan, there are, due to variations between actual requirements and expected actuarial requirements, assets in the trust fund after all liabilities of the Plan to Participants have been satisfied, such remaining assets shall be distributed to the Company."
 
 
 18
 On August 19, 1985, Bluefield's Board of Directors amended the Plan to provide for its termination on August 31, 1985 ("the termination amendment"). At that time, the Plan contained the 1976 version of the residual assets amendment. The termination amendment also added a provision that "[r]esidual [a]ssets will be distributed to or as directed by [Bluefield]." Under the terms of the Plan, as well as ERISA, each participant's right to accrued benefits vested on the termination of the Plan. See Audio Fidelity Corp. v. Pension Benefit Guaranty Corp., 624 F.2d 513, 517 (4th Cir.1980) ("On the date of termination ... the participants no longer were entitled to accrue additional benefits. The rights of both parties became fixed....").
 
 
 19
 At the time of the termination of the Plan, its assets totalled $31.5 million. Through the trustee of the Plan, Bluefield purchased a group annuity contract for $17 million to guaranty the payment to the Plan's participants of all vested benefits. Since the purchase of the $17 million annuity contract satisfied all of Bluefield's benefit obligations under the Plan, the remaining $14.5 million constituted residual assets. They had accumulated as a result of conservative actuarial predictions vis-a-vis the actual experience of the Plan.
 
 
 20
 After appellees made known their intention to distribute the residual assets to Bluefield, appellants commenced the instant class action on April 25, 1986.
 
 
 21
 On November 3, 1986, after motions and rulings not relevant to this appeal, appellants filed an amended class action complaint. The amended complaint named as defendants, in addition to Bluefield, appellees B.W. Harvey, James E. Gillenwater, Mirto A. Corte, C.I. Johnson, Jr., and Robert M. Richardson. The individual defendants were or are officers or directors of Bluefield, or both; they also were or are members of the Bluefield Pension and Retirement Committee. The Flat Top National Bank ("Flat Top"), which was trustee of the Plan at the time the amended complaint was filed, also was named as a defendant, as was appellee A.A. Modena, who was or is an officer and director of both Bluefield and Flat Top.
 
 
 22
 Count I of the amended complaint alleged that distribution of the Plan's residual assets to Bluefield would constitute a breach of fiduciary duty in violation of ERISA. Count II alleged that such distribution would constitute a breach of contract, the contract being the Plan. The amended complaint sought, among other things, reformation of the Plan as it existed at the time of termination so as to make it consistent with the 1951 Plan. Although not alleged expressly in the amended complaint, apparently the result sought by such a reformation was distribution of the residual assets to appellants.
 
 
 23
 In an order entered November 5, 1986, the district court granted a motion by appellants to certify the plaintiff class.
 
 
 24
 On December 10, 1986, the district court held a hearing on the motions for summary judgment which had been filed by appellants, by Flat Top, and by appellees. At the beginning of the hearing, counsel for appellants expressed unequivocal approval of a statement by the court that "counsel [have] agreed that there are no material issues of fact in this case. Am I correct in that statement?"
 
 
 25
 In an opinion filed December 17, 1986, the court granted appellees' motion for summary judgment and denied appellants' motion for the same relief. The court held that the 1951 Plan did not bar the residual assets amendment. The court granted Flat Top's motion for summary judgment on the ground that "all parties agreed ... that Flat Top had not breached its fiduciary duty as of the time of oral argument on motions for summary judgment".
 
 
 26
 Judgment was entered on the opinion of the court on the same day. Appellants appeal from that part of the judgment which grants appellees' motion and denies their motion; they do not appeal from that part of the judgment which grants Flat Top's motion.
 
 
 27
 For the reasons set forth below, we affirm the judgment of the district court.
 
 II.
 
 28
 Section 403 of ERISA sets forth the general rule regarding the uses and purposes of assets in a pension plan:
 
 
 29
 "Except as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title (relating to termination of insured plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."
 
 
 30
 29 U.S.C. Sec. 1103(c)(1) (1982). One of the exceptions to this general rule is ERISA Section 4044, which provides in pertinent part:
 
 
 31
 "(d) Distribution of residual assets; remaining assets(1) Any residual assets of a single-employer plan may be distributed to the employer if--
 
 
 32
 (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
 
 
 33
 (B) the distribution does not contravene any provision of law, and
 
 
 34
 (C) the plan provides for such a distribution in these circumstances."
 
 
 35
 29 U.S.C. Sec. 1344(d)(1) (1982).
 
 
 36
 Appellants do not dispute that the Plan is a "single-employer plan", that "all liabilities of the plan to participants and their beneficiaries have been satisfied," and that "the distribution [to Bluefield of the residual assets] does not contravene any provision of law". The dispute in the instant case is concerned only with whether "the plan provides for such a distribution in these circumstances." In short, the dispute here is concerned only with subdivision (C) of 29 U.S.C. Sec. 1344(d)(1).
 
 A.
 
 37
 Appellants base their argument that the Plan did not provide "for such a distribution in these circumstances" on the language of the Plan as it existed in 1951. In the following "amendment provision", the 1951 Plan provided:
 
 
 38
 "The Company with the consent and approval of the [Pension and Retirement Committee, the members of which were appointed by Bluefield's Board of Directors] may amend this agreement, provided no amendment shall be made which operates to deprive any Participant of benefits already accrued to him as herein provided."
 
 
 39
 Appellants do not argue that the residual assets amendment "operated to deprive any Participant of benefits already accrued to him". Rather, they argue that the scope of the amendment provision was limited by other language in the 1951 Plan--namely, the following "nondiversion provision":
 
 
 40
 "No part of the Fund or interest therein nor any item of property included therein shall be withdrawn, assigned or otherwise transferred in whole or in part, either by the voluntary act of the Company [i.e., Bluefield] or by operation of law, or otherwise, all right, title and interest of the Company in the Fund and all monies and property therein having been absolutely transferred and assigned by this agreement to the Trustee, to be held, managed and administered solely pursuant to this agreement. None of the assets belonging to the Fund hereby created, or of the income therefrom, shall be diverted or used for any purpose other than the exclusive benefit of the Participants as contemplated and provided by this agreement." (emphasis added).
 
 
 41
 Appellants argue that the language emphasized above prohibited Bluefield from amending the Plan to provide for distribution to it of the residual assets because that amendment constituted an "act of the Company" resulting in withdrawal or transfer of the Fund. Under this theory, the residual assets amendment would be without effect, and, according to appellants, they would be entitled to the residual assets under the following "exclusive benefit provision" of the 1951 Plan:
 
 
 42
 "For business necessity, of which its Board of Directors shall be the sole judge, the Company may terminate this agreement and discontinue altogether any such payments into the Fund, in which event the Trustee shall hold all of the Fund as then constituted with the income arising therefrom for the benefit of all Participants in proportion to their respective periods of service to the Company up to that time."
 
 B.
 
 43
 In advancing the above argument, appellants rely on two cases. Audio Fidelity, supra, 624 F.2d 513; Bryant v. International Fruit Products Co., 793 F.2d 118 (6th Cir.), cert. denied, 107 S.Ct. 576 (1986). Mindful that "[e]ach case of this kind is controlled by the language of the documents creating the particular plan involved", Bryant, supra, 793 F.2d at 123, we hold, for the reasons set forth below, that appellants' reliance on both cases is misplaced.
 
 
 44
 In Audio, the employer's pension plan contained an amendment provision stating that "[e]xcept as herein limited [the employer may amend the plan] at any time to any extent it may deem advisable" as long as the amendment does not interfere with the participants' accrued benefits. 624 F.2d at 516-17. The amendment provision expressly limited Audio's power to amend the plan by providing that "no amendment shall have the effect of vesting in the Employer any interest in or control over any Contracts ... or any other property subject to the terms of this Trust". 624 F.2d at 517.
 
 
 45
 After the employer terminated the plan, it discovered that the plan contained residual assets. Seven months after termination, the employer amended the plan to provide for distribution to it of those assets.
 
 
 46
 We held that Audio was not entitled to the residual assets for two reasons. First, we held that the limitation in the amendment provision quoted above expressly prohibited Audio from amending the plan to add the residual assets amendment. Second, we held that "ERISA afforded Audio no basis for altering the substantive terms of the plan after its termination." 624 F.2d at 517.
 
 
 47
 In Bryant, participants in a terminated pension plan sued their employer, seeking to bar the employer from appropriating the plan's residual assets. The district court held that the employer was entitled to those assets under a residual assets amendment functionally identical to the one at issue in the instant case. The court held that the plan as it existed at the time of its creation in 1959 did not prohibit the residual assets amendment which was added in 1982. In a two to one decision, the Sixth Circuit reversed the district court.
 
 
 48
 The pension plan in Bryant contained a "nonreversion provision" and an amendment provision.
 
 The nonreversion provision provided:
 
 49
 "In no event and under no circumstances shall any contributions to this Trust by the Employer, nor any of the Trust Estate or the income therefrom, revert to or be repaid to the Employer; and all amounts paid by the Employer to the Trustees shall be used and applied for the sole and exclusive benefit of the participants under this Trust or their beneficiaries or estates."
 
 
 50
 793 F.2d at 120.
 
 
 51
 The amendment provision provided in relevant part:
 
 
 52
 "The Employer expressly reserves the right to amend this Trust from time to time ...; provided, however, that no such amendment shall cause or permit any part of the Trust Estate to revert to or be repaid to the Employer or be diverted to any purpose other than the exclusive benefit of the participants or their beneficiaries or estates...."
 
 
 53
 793 F.2d at 120.
 
 
 54
 The Sixth Circuit held that the employer was without power to make the residual assets amendment:
 
 
 55
 "Unlike any other plan referred to in this record or in the cited cases, this pension plan assured the participating employees that, once contributed, no money paid into the fund could ever be reclaimed by the company. The company responds that the limitation on amendments referred only to diverting the trust estate, and there was no prohibition against an amendment deleting the reference to contributions. This argument overlooks the absolute language of [the nonreversion provision]: 'In no event and under no circumstances....' This language in itself precludes an amendment that would allow money once contributed to be reclaimed. An agreement that provides that an act can occur in no event and under no circumstances cannot be converted into one that permits the act by a series of amendments that first deletes the reference to the prohibition and then adds a provision permitting the forbidden act...."
 
 
 56
 793 F.2d at 123 (emphasis added).
 
 C.
 
 57
 As must be evident, neither Audio nor Bryant supports appellants' argument on the instant appeal. On the contrary, we hold that those cases, read together with In re C.D. Moyer Company Trust Fund, 441 F.Supp. 1128 (E.D.Pa.1977), aff'd mem., 582 F.2d 1273 (3d Cir.1978), compel the result reached by the district court in the instant case.
 
 
 58
 As we observed in Audio, "[t]he scheme established by ERISA relies upon the provisions of each plan at the time of termination." Audio, supra, 624 F.2d at 517. Since the residual assets amendment was added to the Plan before its termination, it is clear that at the time of termination the Plan provided for distribution of the residual assets to Bluefield. That part of our holding in Audio, therefore, based on the timing of the residual assets amendment does not help appellants. Rather, it demonstrates that the initial hurdle in any case of this type involves the language of the plan at the time of termination. Bluefield has cleared that hurdle.
 
 
 59
 Likewise unavailing to appellants is that part of our holding in Audio based on the language of Audio's amendment provision. That provision contained an express limitation on the power of the company to add a residual assets amendment. By contrast, the amendment provision in the 1951 Plan contained no such limitation. Indeed, the only limitation in that provision on Bluefield's power to amend involved deprivation of accrued benefits. As we have observed, appellants with good reason do not argue that the residual assets amendment deprived any participant of accrued benefits. The amendment provision standing on its own clearly permitted the residual assets amendment. Bluefield therefore has cleared the second hurdle of Audio.
 
 
 60
 Appellants attempt to narrow the facially broad scope of the amendment provision by equating the nondiversion provision in the 1951 Plan to the nonreversion provision in Bryant--the former barring withdrawal from the pension fund "by the voluntary act of the Company ... or otherwise", the latter providing that "[i]n no event and under no circumstances shall any contribution ... be repaid to the Employer".
 
 
 61
 Appellants' argument in this respect fails because it ignores a critical difference between the two provisions. Whereas the prohibitive language in the nondiversion provision of the 1951 Plan arguably barred amendments resulting in a withdrawal or transfer from the "Fund", the nonreversion provision in Bryant went much further in barring "repa[yment]" to the employer of "contributions".
 
 
 62
 The Bryant court recognized this critical difference in distinguishing Moyer, supra, 441 F.Supp. 1128. In Moyer, the original pension plan empowered the employers to amend it, but limited that power by providing:
 
 
 63
 "It shall, however, at all times be impossible, if any alteration, amendment or revocation be made pursuant to this provision, for any of the trust corpus or income to be diverted to or revert to either of the employers or to be used for any purpose other than the exclusive benefit of the participants or their beneficiaries."
 
 
 64
 441 F.Supp. at 1131. On termination of the plan in Moyer, the employers sought to recover the residual assets under an amendment to the original plan. The court held that the limitation on the power to amend, quoted above, did not bar the residual assets amendment since "[i]t seem[ed] clear that at the time the Plan came into existence, the parties considered the phrase 'trust corpus or income' to include only so much of the funds as were necessary to insure full payment of the plan's obligations to the participants." 441 F.Supp. at 1132.
 
 
 65
 The Bryant court distinguished Moyer on the ground that, "[w]hile the language in Moyer limiting the power of the employer to amend the plan was similar to that in the present case, the Moyer agreement made no reference to the return of contributions." Bryant, supra, 793 F.2d at 123. The Sixth Circuit observed that "[e]ven if a surplus from actuarial error might properly be considered not to be a part of the trust estate, nevertheless, the surplus assets did originate as 'contributions' to the trust." Id.
 
 
 66
 As in Moyer, the nondiversion provision in the 1951 Plan made "no reference to the return of contributions", but rather barred withdrawals from "the Fund". We hold that, based on a reading of the 1951 Plan as a whole, the residual assets in Bluefield's Plan, which resulted from actuarial error, were not part of the "Fund". The 1951 Plan defined "Fund" as follows:
 
 
 67
 "All monies paid to the Trustee hereunder and all securities or other property in which the same or any part thereof is invested, together with all income arising therefrom including any profit resulting from the sale of assets therein shall be held by the Trustee in trust for the uses and purposes herein provided and may be referred to herein as the 'Fund'. There shall be deducted from the Fund all taxes, charges and expenses necessarily incurred in the management and administration of the same including compensation to be paid to the Trustee as hereinafter provided and including any losses that may be sustained in the investment or conversion of assets in the Fund and the Fund shall be disbursed by the Trustee as herein provided." (emphasis added).
 
 
 68
 At first blush some of the language in this definition of the "Fund" arguably might be said to encompass residual assets. The italicized phrases establish, however, that, at the time the Plan came into existence, the word "Fund" was intended to include only the assets under the Plan "as were necessary to insure full payment of the [P]lan's obligations to the participants." Moyer, supra, 441 F.Supp. at 1132. This is so because the Fund's only "uses and purposes" set forth in the Plan were the payments of defined benefits to participants. Those defined benefits were calculated according to a formula set forth in the Plan and constituted the maximum amount of money guaranteed to each participant under the Plan. Residual assets, by definition, are assets in excess of those necessary to satisfy defined benefit obligations and therefore do not qualify for the Fund's "uses and purposes".
 
 
 69
 Appellants argue that "Fund" must be read to include residual assets since the Plan made no reference to those assets or to "surplus". Appellants go so far as to suggest that "surplus" is a term made up by appellees during the course of this litigation. This argument is without merit. It fails to consider the common law roots of 29 U.S.C. Sec. 1344(d)(1)(C). "Surplus" is the term used in the common law of trusts to describe any remaining assets in a trust after its purpose has been fulfilled. Under such circumstances, a "resulting trust" for the benefit of the creator of the original trust arises by operation of law, unless he manifested a contrary intent. Restatement (Second) of Trusts Sec. 430 (1959); IV Scott, The Law of Trusts Sec. 430, at 2985-86 (2d ed. 1956); see Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Company, 555 F.Supp. 257, 260 (D.D.C.1983), aff'd mem., 729 F.2d 863 (D.C.Cir.1984); Pollock v. Castrovinci, 476 F.Supp. 606, 616 (S.D.N.Y.1979), aff'd mem., 622 F.2d 575 (2d Cir.1980). Since the resulting trust arises by operation of law, it is irrelevant that the original trust instrument--in this case, the Plan--made no reference to "surplus"--or, under the subsequently enacted ERISA, to "residual assets".
 
 
 70
 Appellants' argument also fails because it ignores the tax laws and Treasury Regulations in effect in 1951. Soon after Bluefield established the Plan, the Internal Revenue Service determined that the Plan was a "qualified" defined benefit plan. As such, it was entitled to favorable tax treatment. Under Section 165(a) of the Internal Revenue Code of 1938, a plan could be "qualified" only--
 
 
 71
 "if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be ... used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries".
 
 
 72
 Internal Revenue Code of 1938, Sec. 165(a)(2) (emphasis added).
 
 
 73
 The Treasury Regulation promulgated under this Section provided in relevant part:"As used in section 165(a)(2), the phrase 'if under the trust instrument it is impossible' means that the trust instrument must definitely and affirmatively make it impossible for the nonexempt diversion or use to occur, whether by operation or natural termination of the trust, by power of revocation or amendment ... or by any other means."
 
 
 74
 Treas.Reg. Sec. 29.165-2(a) (emphasis added). By its use of the phrases "by operation" and "or by any other means", this Regulation supports our conclusion that the similar language in the nondiversion provision on which appellants rely ("either by the voluntary act of the Company or by operation of law, or otherwise" (emphasis added)) was not intended as a limitation on Bluefield's power to amend the Plan to provide for distribution of the residual assets. Rather, the Plan's limitation on the power to amend, if any, applied only to amendments resulting in "the nonexempt diversion" (i.e., diversion other than that "prior to the satisfaction of all liabilities"). The Regulation also establishes that Bluefield had the right under the tax laws to recover residual assets even without an express reservation of that right in the Plan. Id. Sec. 29.165-2(b) (employer can recover surplus in trust resulting from actuarial error; no requirement that employer expressly reserve that right). See Pollock, supra, 476 F.Supp. at 612-13 ("An employer is foreclosed only from recovering surpluses which arise from prohibited amendments, such as changes in benefit provisions or eligibility requirements.... The plan, therefore, did not explicitly reserve a right to recover residual assets since, under IRS Rules, none should have been intentionally created.").
 
 
 75
 Other language in the nondiversion provision also supports our construction of the Plan. There is language in that provision that the Fund shall not "be diverted or used for any purpose other than the exclusive benefit of the Participants as contemplated and provided by this agreement." (emphasis added). Since the Plan neither contemplated nor provided for distribution of residual assets to the participants, the prohibitive language in the nondiversion provision on which appellants rely cannot be read to bar amendments to the Plan to provide for distribution of the residual assets to Bluefield.[1]
 
 D.
 
 76
 When read together, Audio, Bryant, and Moyer demonstrate that Bluefield is entitled to the residual assets. Bluefield has cleared both hurdles set forth in Audio: at the time of its termination, the Plan provided for distribution of the residual assets to Bluefield; and the 1951 amendment provision did not limit Bluefield's power to adopt the residual assets amendment. The limitation on the power to amend in the nonreversion provision of Bryant is not present in the instant case: the nondiversion provision in the 1951 Plan, if it barred amendments, barred only those amendments resulting in withdrawal or transfer of the "Fund". As in Moyer, the term "Fund", when considered in light of the 1951 Plan as a whole, must be interpreted not to include residual assets.
 
 
 77
 Accordingly, we hold that the district court correctly held that Bluefield is entitled to the residual assets.
 
 III.
 
 78
 Appellants' second claim on the instant appeal need not detain us long.
 
 
 79
 Appellants claim that, since their interpretation of the 1951 Plan at least is reasonable, the 1951 Plan is ambiguous and therefore the district court erred in disposing of the action by summary judgment. Bear Brand Hosiery Co. v. Tights, Inc., 605 F.2d 723, 726 (4th Cir.1979) ("Only an unambiguous writing justified summary judgment, and no writing is unambiguous if 'susceptible of two reasonable interpretations.' ") (quoting American Fidelity and Casualty Co. v. London and Edinburgh Insurance Company, 354 F.2d 214, 216 (4th Cir.1965)).
 
 
 80
 In considering appellants' claim, we have viewed the language of the 1951 Plan, and the "inferences to be drawn" from that language, "in the light most favorable" to appellants. Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985).
 
 
 81
 For the reasons stated above in Part II of this opinion, we hold that appellants' interpretation of the Plan is not a reasonable one in light of the Plan as a whole. Since the 1951 Plan was not ambiguous, appellants' claim is without merit.
 
 
 82
 Accordingly, we hold that the district court correctly disposed of the action by summary judgment.
 
 IV.
 To summarize:
 
 83
 Under ERISA, residual assets may be distributed to the employer on termination of a pension plan if, among other things not relevant here, "the plan provides for such a distribution in these circumstances." In the instant case, the 1985 version of the Plan provided for such distribution under the residual assets amendment. Appellants argue that the 1951 Plan barred the residual assets amendment in that, under the nondiversion provision, that amendment constituted a "withdraw[al]" or "transfer[ ]" of the "Fund" by "voluntary act of the Company ... or otherwise". If indeed the nondiversion provision limited in any way the power of Bluefield to amend the Plan, however, that provision did not bar the residual assets amendment because residual assets are not part of the "Fund" as that term must be interpreted in light of the 1951 Plan as a whole. Accordingly, we hold that the district court correctly held that Bluefield is entitled to the residual assets.
 
 
 84
 Further, since the 1951 Plan considered as a whole was not ambiguous, we hold that the district court correctly disposed of the action by summary judgment.
 
 
 85
 We affirm the judgment of the district court granting appellees' motion for summary judgment and denying appellants' motion for summary judgment.
 
 
 86
 AFFIRMED.
 
 K.K. HALL, Circuit Judge, dissenting:
 
 87
 I agree that a resolution of the competing claims to the residual assets in Bluefield Supply Company's ("Bluefield" or "the company") terminated pension plan requires, at the threshold, an examination of the written terms of the 1951 plan. I cannot, however, agree with the majority's view that the unambiguous language of that plan allowed the adoption of the terminating amendment cited by the district court as a basis for granting summary judgment in favor of the Bluefield.[1] In my view, the language of the 1951 plan is reasonably susceptible to at least one contrary interpretation, thereby rendering summary judgment inappropriate.
 
 
 88
 Although it is undisputed that the 1951 plan contained an "amendment provision" allowing the company to modify the agreement, the plan also contained what the majority describes as a "nondiversion provision." Under the terms of that provision:
 
 
 89
 "No part of the Fund or interest therein nor any item of property included therein shall be withdrawn, assigned or otherwise transferred in whole or in part, either by the voluntary act of the Company [i.e., Bluefield] or by operation of law, or otherwise, all right, title and interest of the Company in the Fund and all monies and property therein having been absolutely transferred and assigned by this agreement to the Trustee, to be held, managed and administered solely pursuant to this agreement. None of the assets belonging to the Fund hereby created, or of the income therefrom, shall be diverted or used for any purpose other than the exclusive benefit of the Participants as contemplated and provided by this agreement."
 
 
 90
 Recently, the Sixth Circuit in Bryant v. International Fruit Products Co., Inc., 793 F.2d 118 (6th Cir.1986), found that a similar provision in a pension plan precluded the adoption of a residual assets amendment by the company. That provision, which the majority seeks to distinguish as a "nonreversion provision," provided that:
 
 
 91
 In no event and under no circumstances shall any contributions to this Trust by the Employer, nor any of the Trust Estate or the income therefrom, revert to or be repaid to the Employer; and all amounts paid by the Employer to the Trustees shall be used and applied for the sole and exclusive benefit of the participants under this Trust or their beneficiaries or estates."
 
 
 92
 The court in Bryant concluded that "[a]n agreement that provides that an act can occur in no event and under no circumstances cannot be converted into one that permits the act by amendment...." Bryant, 793 F.2d at 123.
 
 
 93
 Obviously the language in the Bluefield plan is not identical to the provision at issue in Bryant. I believe it is clear, however, that both provisions contemplate that assets assigned to a pension plan are, thereby, placed forever beyond the possibility of recapture by the donating company. Indeed, the language in the Bluefield plan is arguably stricter since it prohibits any withdrawal, assignment or transfer while the Bryant provision bars only direct reversion to the employer.
 
 
 94
 The majority, however, suggests that when Bryant is read in conjunction with In re C.D. Moyer Company Trust Fund, 441 F.Supp. 1128 (E.D.Pa.1977), aff'd mem., 582 F.2d 1273 (3d Cir.1978), the resulting synthesis supports Bluefield's right to add its residual assets amendment. In Moyer, the court approved a residual assets amendment although the original plan barred any amendment that would cause the "trust corpus ... to be diverted to or revert to either of the employers." Moyer, 441 F.Supp. at 1131. The court concluded that the parties to the agreement intended "trust corpus" to include only those funds necessary to satisfy the specific pension benefits stated in the plan. The majority agrees with the district court that a similar interpretation should be applied to the word "Fund" as used in the Bluefield plan. I am singularly unpersuaded by this view.
 
 
 95
 As an initial matter, I believe that the effort to reconcile Bryant and Moyer represents a questionable attempt to mix oil and water. Although both cases purport to turn on the contract language used in the pension plans, a careful reading demonstrates that each represents a competing view of desirable public policy with regard to pension plan surpluses. The court in Moyer was clearly convinced that employers should not be "penalized" for overfunding pension plans and that employees should not receive "windfalls due to the employer's mistake." Moyer, 441 F.Supp. at 1132-33. The Bryant court, however, believed that any benefit attendant a company's effort to recapture its contributions would constitute a windfall to the employer, at least to the extent that the employer had previously obtained tax advantages from the contributions. Bryant, 793 F.2d at 123.
 
 
 96
 Neither Moyer nor Bryant are controlling authority and the majority could have elected to follow either. In light of the clear philosophical split presented by those decisions, I question the majority's effort to apply both. Moreover, to the extent that this Circuit has taken any position on the policy implications raised by pension fund surpluses, we have arguably leaned toward the rationale later embodied in Bryant. See Audio Fidelity Corp. v. Pension Benefit Guaranty Corp., 624 F.2d 513 (4th Cir.1980).[2]
 
 
 97
 Even if Moyer alone is viewed as persuasive authority, I fail to see how it would support summary judgment in favor of Bluefield in this case. The court in Moyer did not discuss with any particularity the reason for its narrow interpretation of "trust corpus." In the present case, however, the "Fund" to which the nondiversion clause applies is expressly defined as "[a]ll monies paid to the Trustee hereunder and all securities or other property in which the same or any part thereof is invested, together with all income arising therefrom...."
 
 
 98
 The majority maintains, as did the district court, that this expansive definition is limited by requirements that the trustee hold the fund "for the uses and purposes herein provided." Although it would appear to me that the language relied on by the majority deals with the Trustee's duties during the operation of the pension plan rather than the actual composition of the "Fund," I do not contend that the majority's view is totally unreasonable. The question before us, however, is not whether the interpretation of the plan advanced by the company and accepted by both the district court and the majority is unreasonable. The issue is whether the company's interpretation is so unquestionably correct as to render summary judgment appropriate. I think it is not.
 
 
 99
 The majority concedes that "[a]t first blush," the definition of "Fund" arguably includes residual assets. In my view the existence of a reasonable alternative interpretation of the plan, at the very least, indicates that the language of the plan is ambiguous. For purposes of summary judgment, therefore, the district court was required to either resolve the ambiguity against Bluefield as both the moving party and the drafter of the contract language or alternatively, to allow the case to proceed to the trier of fact for a determination of the intent of the parties with regard to the residual assets. Under either approach, the grant of summary judgment in favor of Bluefield was improper.
 
 
 100
 Accordingly, I would reverse the grant of summary judgment and remand for further proceedings. I, therefore, respectfully dissent.
 
 
 
 [1]
 Appellants argue that the 1951 Plan in fact did provide for distribution of any residual assets to the participants since the exclusive benefit provision stated that, on termination of the Plan, the Fund and "all income arising therefrom" would be held "for the benefit of all Participants in proportion to their respective periods of service to the Company up to that time." We find this argument to be without merit. Another provision of the 1951 Plan--the provision which set forth the formula for calculating benefits--stated that in no event shall "the amount awarded and paid hereunder to any Participant ... be more than Five Thousand ($5,000.00) a year." If the exclusive benefit provision were read to apply to residual assets, then it would conflict with the cap on benefits. The only reasonable interpretation of the exclusive benefit provision, therefore, is that the Fund on termination would be distributed "in proportion to [the participants'] respective periods of service" only if the Plan was underfunded at the time of termination
 
 
 [1]
 The majority opinion focuses upon the propriety of the 1973 residual assets amendment rather than the terminating agreement adopted by the company on August 19, 1985. Although I believe it is clear that the district court relied on the later provision, it is of no particular significance with regard to the substance of either the majority's position or my own. Both amendments called for a reversion of surplus funds to the company. The issue of whether the plan allowed either amendment is subject to the same analysis
 
 
 [2]
 I do not suggest that Audio Fidelity is dispositive of the instant appeal. There are clear differences between the pension plan in that case and the Bluefield plan. Clearly Audio Fidelity may be factually distinguished on that basis alone. Nevertheless, this Court therein plainly rejected any contention that allowing surplus pension assets beyond those needed for specific benefits to be paid to employees amounted to "unjust enrichment." Audio Fidelity, 624 F.2d at 518. At a minimum, I believe that Audio Fidelity suggests that this Court has discerned no particular public policy favoring employers in disputes involving surplus pension assets