980 F.2d 889
 142 L.R.R.M. (BNA) 2077
 INTERNATIONAL UNION OF ELECTRONIC, ELECTRIC, SALARIED,
MACHINE AND FURNITURE WORKERS, AFL-CIO; James R.
Baldwin; Harry J. Layne; Rodney J.
Pettinato; Pauline Rothermel;
Marlyn Thompson
v.
MURATA ERIE NORTH AMERICA, INC., A Georgia Corporation, Appellant.
 No. 91-3513.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 10, 1992.
Decided Nov. 30, 1992.
 
 Jesse P. Schaudies, Jr. (argued), Kenneth P. Russell, Jr., Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., R. Scott Tobin, Michael A. Caldwell, Weinstein, Rosenthal, Tobin & Caldwell, Atlanta, Ga. for appellant.
 Charles R. Both (argued), John F. Colwell, Yablonski, Both & Edelman, James G. Mauro, Jr. I.U.E., Washington, D.C., for appellees.
 Stephen R. Bruce, Washington, D.C. (Robert J. Mozer, Mozer & Swetnick, of counsel), for amicus appellees Nat. Council of Senior Citizens.
 Before: BECKER, ROTH and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This appeal by defendant Murata Erie North America, Inc. ("Murata") requires us to decide who is entitled to the excess funds remaining in two pension plans ("the Plans") after their termination. Murata, the Plans' sponsor, terminated the Plans in July 1987 as part of a larger scheme to end operations at its Erie, Pennsylvania plant. To satisfy the Plans' liabilities, the Plan Administrator purchased annuities for all the participants, after which nearly seven million dollars remained. Murata recouped this remaining sum in 1989 pursuant to an amendment to the Plan documents that it had unilaterally adopted in 1985. The amendment allowed the Plans' sponsor to recoup any excess moneys remaining in the Plans upon termination.
 
 
 2
 Believing that they, instead of Murata, were entitled to the excess money, some of the Plans' participants and their collective bargaining agent, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL-CIO ("IUE" or "the union"), brought this suit against Murata, asserting two related claims under section 502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a) (1988). The plaintiffs, appellees herein, allege (1) that Murata breached its fiduciary duty to act in accordance with the documents governing the plan, ERISA § 404(a)(1)(D), 29 U.S.C. §§ 1104(a)(1)(D) (1988), by amending the Plans to allow recoupment of excess funds and then actually recouping the funds; and (2) that Murata violated ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1) (1988), by recouping the excess funds without authorization from the Plan documents.
 
 
 3
 The district court granted summary judgment for the plaintiffs on their ERISA claims, rejecting Murata's defenses that the suit was untimely under the ERISA statute of limitations, that the 1985 amendment was permissible under the Plan documents, and that even if the amendment was invalid, proper construction of the Plan documents would allow Murata to recoup the excess funds. 772 F.Supp. 870 (W.D.Pa.1991).
 
 
 4
 For reasons that follow, we find that the statute of limitations does not bar the ERISA claims. We also conclude, however, that there are genuine issues of material fact as to whether the collective bargaining agreement, which is considered part of the Plan documents under ERISA, prohibited the 1985 amendment and whether the Plan documents otherwise prohibited reversion of the excess funds remaining in the Plans upon termination. We will therefore reverse the judgment of the district court and remand for further proceedings.[1]
 
 I. FACTS AND PROCEDURAL HISTORY
 
 5
 In 1949, Murata's predecessor corporation, Erie Technological Products, Inc., created an employee retirement plan, styled the Erie Technological Products, Inc. Hourly Benefit Plan. In 1973, a closely related predecessor corporation adopted a similar, but separate plan, the Fryling Manufacturing, Inc. Hourly Employee Benefit Plan (jointly "the Plans"). Both plans were defined benefit plans, which means that they were "designed and administered to provide fixed--or 'defined'--benefits to the participants based on a benefit formula set forth in the Plan." Wilson v. Bluefield Supply Co., 819 F.2d 457, 459 (4th Cir.1987). The Plans' sponsor was obligated to maintain funding for the Plans at whatever level was actuarially required to provide the benefits guaranteed by the Plans.[2] Beginning in 1951, the Plans' participants were represented in collective bargaining by the IUE, and the union and the companies negotiated various alterations to the terms of the Plan documents over the years of the Plans' existence.
 
 
 6
 From their inception until 1977, the two Plans contained specific and identical language regarding the procedure for amendment and termination. Article XIII of the Plans described the manner in which the Plans might be terminated:
 
 
 7
 [E]ach participating Company must, and hereby does, subject to any collective bargaining agreement then in effect, reserve the right to terminate the Plan on its own behalf, in whole or in part, at any time.... Termination of the Plan shall be effective upon the date specified in such instrument, but such termination shall not vest in the terminating Company any right, title or interest in or to the funds held hereunder, except as provided in Section 13.04 D 6.... (emphasis added).
 
 Section 13.04(D), in turn, provided:
 
 8
 [T]he net assets after provision is made for administrative expenses and expenses of liquidation, shall be applied to payment of benefits in the following order:
 
 
 9
 ....
 
 
 10
 (6) By distributing to the Company any excess remaining in the Fund due to erroneous actuarial computation as defined in Treasury Regulations. (emphasis added).
 
 
 11
 Article XIV described the procedure for amending the Plans:
 
 Article XIV
 
 12
 14.01 Right to Amend Reserved: The Company may, without the assent of any other party, except as otherwise provided by any collective bargaining agreement then in effect, amend the Plan at any time. Any such amendment shall be expressed in an instrument executed by the Company on the order of its Board of Directors and filed with the Trustee, and the Administrator, and shall become effective as of the date specified in such instrument.
 
 
 13
 14.02 Limitations on Right to Amend: No such amendment shall vest in the Company any right, title or interest in or to the funds held by the Trustee. No such amendment shall, without his consent, deprive, limit, lessen or restrict any vested right or interest to which any member is then entitled hereunder nor shall any amendment be made contrary to the written terms of any written agreement with a bargaining unit, so long as such agreement is in effect....
 
 
 14
 (emphasis added).
 
 
 15
 In 1977, pursuant to Congress's enactment of ERISA, the Plans were restated. Although Article XIV remained unchanged, the restatement altered the terms of section 13.04(D)(6)[3] so that, instead of providing for the reversion of excess funds due to erroneous actuarial computation to the employer, it stated the following:
 
 
 16
 [T]he net assets after provision is made for administrative expenses and expenses of liquidation, shall be applied to payment of benefits in the following order:
 
 
 17
 ....
 
 
 18
 (6) To the extent not provided for in the foregoing subsections (1), (2), (3), (4), and (5), to provide any other benefits specified in the plan.
 
 
 19
 Thus, as of 1977, the Plans contained no specific language regarding reversion of excess funds, except for the language in Articles XIII and XIV, which suggested that the funds could not revert to the Company at all.
 
 
 20
 The parties dispute why the terms of the Plan were altered in this manner in the 1977 restatement of the Plans. Murata argues that the insertion of the new subsection (6) was the result of a scrivener's error, and that the parties never intended to delete the employer's right of reversion for excess funds due to erroneous actuarial computation. To support its claim, Murata submitted the affidavit of one of its officials, Raymond Bertone, who was familiar with the 1977 restatement. Bertone represented in his affidavit that Murata's predecessor corporation did not intend to abandon its right to recoup excess funds upon termination. The plaintiffs, noting that the language of the 1977 Plans fails to mention that excess funds might revert to the employer, contend that the language of the Plans unambiguously prohibits such reversion, and, therefore, that Murata's recoupment was impermissible. Whichever the case, neither party objected to the 1977 Plans at the time they were drafted, and the restated Plans were incorporated into collective bargaining agreements reached between the union and the predecessor corporations in 1978 and 1981.
 
 
 21
 Late in 1981, Murata bought the predecessor corporations from the previous Plan sponsors, assumed the obligations of the collective bargaining agreements, and became the Plans' sponsor. The issue of ownership of the excess assets in the Plans, the subject matter of the present dispute, first became a source of contention between Murata and the union during collective bargaining sessions in 1984. The parties agree that Murata proposed terminating the Plans and establishing a profit-sharing plan for employees, an arrangement that would have been similar to the profit-sharing arrangements that Murata maintained with its employees at its other plants. The parties dispute, however, precisely what happened during those negotiations.
 
 
 22
 The plaintiffs contend that Murata proposed an amendment to the Plan documents that would have given it a right of reversion to the excess funds in the documents. The plaintiffs assert that the union vigorously opposed this amendment and that Murata eventually withdrew it. Murata, through the affidavits of its corporate officers, denies that it ever made any such proposal. The parties both concede that no such agreement allowing for reversion was included in the collective bargaining agreement reached between the union and Murata in 1984. That agreement contained a simple clause, section 57, which dealt with the Plans:
 
 
 23
 The Pension and Welfare Plan for hourly paid employees has been described in the Plan and Trust Agreement and the terms thereof have been agreed to between the Company and the Union.
 
 
 24
 . . . . .
 
 
 25
 It is further agreed that during the period of three (3) years from the effective day of August 13, 1984, neither the Company nor the Union shall demand any change in the Pension and Welfare Plan.
 
 
 26
 In October 1985, Murata unilaterally amended the Plans to include a new section 9.07(f), which presumably displaced the pre-1977 section 13.04(D)(6). Instead of providing for return to the employer of that excess in the funds resulting from erroneous actuarial computation, the new section provided for "return of any excess funds to the Employer or reallocated to the Participants, if authorized by the Employer, only after satisfaction of liabilities, fixed and contingent." (emphasis added). Murata posted notice at its Erie facilities that it had amended the Plans and that employees could obtain copies of the amendments from the company. This notice was also given to the union officers. Murata concedes that the notice provided did not mention the content of the amendment but contends that such details were available from company representatives upon request.
 
 
 27
 During 1986, Murata began to make arrangements to terminate operations at its Erie plant. Discussions between the union and Murata began to focus, at least in part, on what would happen to any excess funds remaining in the Plans if annuities were purchased for all employees and the Plans terminated. During one conversation, between union representative Edward Bordonaro and Murata's vice president, Robert Entrekin, on November 20, 1986, Murata apparently asserted that it had a right to any excess funds remaining in the Plans upon termination. This conversation was confirmed in a letter, dated the following day, from union counsel James Mauro to Entrekin:
 
 
 28
 As we understand it, there is a potential dispute as to the distribution of excess assets in the Pension Plans which are sponsored by the Company on behalf of the hourly and salaried employees of 'Fryling Manufacturing, Inc.' It is the position of the Union that these assets must be reserved exclusively for the benefit of the members of the Plan and their beneficiaries under the terms of the current collective bargaining agreement and its predecessors, at least since 1973.
 
 
 29
 Negotiations between Murata and the union apparently yielded no agreement about how to resolve the dispute over the excess funds.
 
 
 30
 In December 1986, Murata ended operations at its Erie facility. On July 30, 1987, Murata filed notice with the Pension Benefit Guaranty Corporation (PBGC) that it intended to terminate the Plans. The union opposed this effort and, over the next two months, unsuccessfully attempted to arbitrate the decision to terminate the Plans. On September 30, 1987, Murata terminated the Plans. The plaintiffs concede that all Plan participants and beneficiaries received all defined benefits to which they were entitled upon termination of the Plans via the purchase of annuities. For reasons that are not entirely clear, Murata waited to recoup from the Plan trustee the remaining excess in the Plans--a total of $6,929,297.37--until September 5, 1989.
 
 
 31
 On November 29, 1989, the union and five participants in the Plans brought suit against Murata in the United States District Court for the Western District of Pennsylvania under ERISA § 502(a), 29 U.S.C. § 1132(a) (1988). Specifically, the plaintiffs alleged that Murata's amendment of the Plans to allow reversion and its subsequent recoupment of the excess funds were in contravention of the terms of the Plan documents and therefore violated ERISA §§ 404(a) and 4044(d)(1), 29 U.S.C. §§ 1104(a) & 1344(d)(1) (1988). The district court subsequently certified the action as a class action on behalf of all participants and beneficiaries in the Plans.
 
 
 32
 Shortly after Murata answered the plaintiffs' complaint, the parties filed cross-motions for summary judgment. Murata alleged that the statute of limitations for both ERISA and LMRA barred the filing of the plaintiffs' suit. The district court denied Murata's statute of limitations-based motion for summary judgment, reasoning that the ERISA cause of action began to accrue only when Murata actually recouped the excess funds, which was three months before plaintiffs filed suit and well within the ERISA statute of limitations. The court also rejected Murata's argument that it was entitled to summary judgment based on the equitable doctrine of laches because, according to the court, there was no undue delay in the filing of the case that resulted in prejudice to Murata.[4]
 
 
 33
 The district court initially denied the plaintiffs' motion for summary judgment on the merits issues, because, although it found Murata's October 25, 1985 amendment invalid, it believed that there were genuine issues of material fact as to why there was a surplus in the Plans. At this initial stage, the court believed that the case hinged on whether the source of the funds in the Plans was Murata or the employees, and reasoned that if Murata had, in fact, contributed to the Plans, then it would be entitled to the excess remaining in the Plans upon termination.
 
 
 34
 After additional discovery, both parties again cross-moved for summary judgment. This time, the court granted summary judgment for the plaintiffs on their ERISA claims. In so doing, the court reaffirmed its earlier determination that the 1985 amendment to the Plans was invalid and concluded that, in the absence of the amendment, there was no "affirmative provision [allowing for] reversion [of residual assets]" in the Plans. Given that there was no such provision, the court reasoned that section 4044(d)(1) of ERISA, 29 U.S.C. § 1344(d)(1), which requires some form of authorization in the plan for an employer to recoup excess funds, prohibited the reversion of funds to Murata and that Murata had breached its fiduciary duty under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), by amending and then recouping in contravention of the Plan documents. The court granted the plaintiffs' requested relief: it directed Murata to provide an accounting to both the court and the plaintiffs of the status of the excess funds in the Plans and further directed the placement of such funds in a trust to be administered by an independent administrator and eventually distributed to the participants and beneficiaries.
 
 
 35
 Murata appealed from the district court's final order. The district court had jurisdiction over the case under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) (1988) and LMRA § 301(a), 29 U.S.C. § 185(a) (1988). We have jurisdiction over this appeal under 28 U.S.C. § 1291 (1988).
 
 
 36
 II. THE ERISA STATUTE OF LIMITATIONS FOR BREACH OF FIDUCIARY DUTY
 
 A. Introduction; The Parties' Contentions
 
 37
 ERISA's statute of limitations prohibits filing suit more than six years after "the date of the last action which constituted a part of the breach or violation," or more than three years after the plaintiff had "actual knowledge of the breach or violation," whichever is earlier. See ERISA § 413, 29 U.S.C. § 1113 (1988).[5] Murata amended the Plans on October 25, 1985, and the plaintiffs filed suit on November 25, 1989, well within the six-year period. Therefore, to prevail on its statute of limitations argument, Murata must demonstrate that the plaintiffs had actual knowledge of the breach of fiduciary duty more than three years before they filed suit.
 
 
 38
 Murata argues that the type of ERISA violation that the plaintiffs allege--a breach of fiduciary duty under ERISA § 404, 29 U.S.C. § 1104--does not require that participants be denied benefits to bring suit. Compare Ziegler v Connecticut General Life Ins. Co., 916 F.2d 548, 551 (9th Cir 1990) (ERISA statute of limitations begins to run when actions constituting breach take place and not when actual harm is suffered by the plaintiffs). Therefore, Murata contends, plaintiffs could have brought suit as soon as the Plans were amended. Murata argues that plaintiffs had actual knowledge of the alleged breach because the Company posted notice on October 25, 1985 that the Plan documents had been amended and also informed the union's officers of the amendment.[6] Although the notice merely stated that the Plan documents had been amended and did not mention the content of the amendments, Murata argues that such notice provided the plaintiffs with actual knowledge of the breach of fiduciary duty as plaintiffs define it--an unauthorized, unilateral change in the Plans. Therefore, Murata urges that the statute began to run on the date of amendment, or at least on the date that notice was provided, both of which occurred more than three years before the initiation of this suit.[7]
 
 
 39
 The plaintiffs respond that the statute did not begin to run until Murata actually recouped the funds in September 1989. They urge that the breach of fiduciary duty was a series of three acts: the amendment to the plans on October 25, 1985, allowing reversion of the funds to the Company; the termination of the Plans on September 30, 1987; and the actual reversion of the funds to Murata on September 5, 1989. The plaintiffs argue that the statute of limitations did not begin to accrue until the actual reversion three months before suit was actually brought, which was well within the three-year limitations period.
 
 
 40
 The plaintiffs further contend that, even if the breach of fiduciary duty was complete with the amendment of the Plans on October 25, 1985, the statute of limitations still did not begin to run because the plaintiffs lacked actual knowledge of the breach. The plaintiffs point out that there is no evidence suggesting that any of the Plan participants actually knew in 1985 that the Plans had been amended. Moreover, the plaintiffs contend, the notice that Murata did provide could not give rise to a finding of actual knowledge, even if all the plaintiffs had read it, because it did not contain specific notice of the content of the amendment.
 
 
 41
 We must first consider when the breach of fiduciary duty took place, for if the plaintiffs and the district court are correct that the breach was not complete until the recoupment of the funds in 1989, then the suit was timely filed under ERISA § 413, 29 U.S.C. § 1113.
 
 
 42
 B. The Date on Which the Breach of Fiduciary Duty Took Place
 
 
 43
 The district court accepted the plaintiffs' theory of a multi-step or continuing breach and concluded that the ERISA statute of limitations did not begin to run until Murata actually recouped the excess funds, three months before the filing of suit. We find the district court's analysis unpersuasive, and we agree with Murata that the breach of fiduciary actually took place when the Plans were amended, on October 28, 1985. This conclusion is compelled by our recent decision in Gluck v. Unisys Corp., 960 F.2d 1168 (3d Cir.1992).
 
 
 44
 In Gluck, the plaintiffs were participants in a plan that was partially contributory and partially non-contributory. Members who donated to the contributory portion of the plan were scheduled to receive additional benefits upon retirement. The sponsoring company amended the plan to terminate the contributory portion of the plan, such that both the contributory and non-contributory portions of the plan would receive the same benefits. Participants in the contributory portion of the plan brought suit, arguing that the termination of the contributory portion denied them benefits that had vested under the terms of the plan, in contravention of 26 U.S.C. § 411(d)(3). The plaintiffs claimed, inter alia, a breach of fiduciary duty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A). The defendants argued that the suit was time-barred under ERISA § 413, 29 U.S.C. § 1113. By way of identifying the actual date of the breach of fiduciary duty, we held:
 
 
 45
 The 1984 failure to vest fully the accrued benefits upon partial termination of a plan could constitute a violation of 26 U.S.C. § 411(d)(3), and fiduciaries responsible for that amendment might be responsible for the violation under a breach of fiduciary duty theory. Section 1113(1)'s six-year limitations period would run from the date of the amendment's adoption.
 
 
 46
 Id. at 1178 (emphasis added).
 
 
 47
 We find no significant distinction between the situation in Gluck and the one at bar. Here, Murata amended the Plans in a manner arguably violative of their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, just as the defendant in Gluck arguably breached its fiduciary duty by amending the plans in a manner inconsistent with another ERISA provision. Further, in both cases, the defendants took subsequent steps that caused a transfer of assets later claimed by the plaintiffs. Nevertheless, in Gluck, we considered the date of the amendment to be the date on which the breach of fiduciary duty occurred, and, controlled by that decision, we consider the date of the breach of fiduciary duty in this case to have been October 25, 1985.[8]
 
 
 48
 C. The Date on Which Plaintiffs Had Actual Knowledge of the Breach
 
 
 49
 Because the alleged breach of fiduciary duty took place on October 28, 1985, less than six years but more than three years before the initiation of this lawsuit on November 23, 1989, we must decide whether, under ERISA § 413, 29 U.S.C. § 1113, plaintiffs had "actual knowledge" of the breach more than three years before filing.
 
 
 50
 Our decision with regard to "actual knowledge" is also controlled by Gluck. In Gluck, after determining the date of the breach of fiduciary duty, we construed the term "actual knowledge" in ERISA § 413(2), 29 U.S.C. § 1113(2). The district court in Gluck had held that the breach of fiduciary duty claim was time-barred on the ground that plaintiffs had knowledge of all of the actions that constituted the breach more than three years before they filed suit. We reversed because we concluded that, although the breach of fiduciary duty had occurred more than three years before the initiation of the suit and the plaintiffs had knowledge then of the events constituting the breach, the district court had not determined whether the plaintiffs actually knew at that time that a claim of breach or violation under ERISA existed.
 
 
 51
 In so holding, we defined "actual knowledge" as follows:
 
 
 52
 We hold that under 29 U.S.C. § 1113(2) "actual knowledge of a breach or violation" requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, ... knowledge of a transaction's harmful consequences, ... or even actual harm....
 
 
 53
 Gluck, 960 F.2d at 1177 (citations omitted). We specifically rejected a formulation of the test for actual knowledge proffered by the defendant, which would have required defendants to prove only that the plaintiffs had "knowledge of the transaction that constituted the alleged violation, not ... knowledge of the law." See id. at 1178 (quoting Blanton v. Anzalone, 760 F.2d 989, 992 (9th Cir.1985)). Instead, we found that ERISA § 413, 29 U.S.C. § 1113, set a higher standard for barring claims against fiduciaries: "We disagree that mere knowledge of a transaction is always enough. 'Actual knowledge of a breach or violation' requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated." Id. (emphasis added). Gluck therefore requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA.
 
 
 54
 Applying this test in Gluck, we determined that it was not clear from the record whether plaintiffs had actual knowledge of the defendant's alleged breach of fiduciary duty, even though plaintiffs clearly knew that the defendant had adopted the amendment that allowed the breach to occur. We held that participants in the company's plan could not be deemed to have had actual knowledge because, although they knew of the contents of the amendment, the amendment itself disguised the potential for breach of a fiduciary duty. See id. at 1178. Further, the literature that the company distributed to employees announcing the amendment was misleading. See id. at 1179. We therefore remanded to the district court for a finding of the date on which the plaintiffs acquired actual knowledge.
 
 
 55
 Based on the test articulated in Gluck, we hold that Murata has failed to make the showing of actual knowledge necessary to meet the "stringent requirement" imposed by ERISA § 413(2), 29 USC § 1113(2). See Gluck, 960 F.2d at 1176. Murata has failed to present evidence to show that any of the plaintiffs had actual knowledge of a potential breach of fiduciary duty claim in 1985 when Murata amended the Plan documents. Murata concedes that the notice it provided to the plaintiffs in October 1985 did not discuss the content of the amendment. Rather, the notice simply stated, in general terms, that the Plans had been amended. Whereas the plaintiffs in Gluck were informed of the content of the amendment but may not have known its full legal import, there is no showing here that the plaintiffs even knew that the Plan documents had been amended to allow reversion of excess funds to Murata.[9]
 
 
 56
 Murata argues that, since the plaintiffs claim that any amendment to the Plan documents would have been a breach of fiduciary duty, the plaintiffs must have known that there had been such a breach when they learned that the Plan documents had been amended, even if they did not know the content of the amendment. We find this argument unpersuasive. Murata has made no showing that plaintiffs actually knew what their lawyers now contend--that any amendment to the Plan documents was a breach of fiduciary duty.
 
 
 57
 Murata also contends that the union officers knew of the breach by at least November 20, 1986, when union official Bordonaro met with Murata's Entrekin and discussed the possibility of funds reverting to Murata upon termination. This conversation was confirmed in writing the next day through a letter from union counsel Mauro to Entrekin, which stated that there was a potential dispute over Murata's right to recoup excess funds remaining upon termination of the Plans. All of this took place slightly more than three years before the plaintiffs filed their suit, and Murata contends that it evidences actual knowledge on the part of the plaintiffs.
 
 
 58
 We disagree. Mauro's letter in no way suggests that participants in the Plans knew that there was a controversy over the reversion of excess funds. Moreover, the letter's acknowledgment that there was a dispute over reversion does not suggest that any of the plaintiffs knew that the Plans contained an amendment allowing for such reversion. Indeed, the letter specifically stated the union's understanding that, under the Plan documents, the employees and not Murata were entitled to the funds, which suggests that the plaintiffs were not then aware of the October 1985 amendment.
 
 
 59
 In sum, Murata has failed to demonstrate that the plaintiffs had actual knowledge of the alleged breach of fiduciary duty more than three years before they filed suit. Because plaintiffs initiated this action less than six years after the alleged breach of fiduciary duty, and because there is insufficient evidence to show they had actual knowledge of the breach more than three years before bringing suit, we hold that their suit is not time-barred under ERISA § 413, 29 U.S.C. § 1113.[10]
 
 
 60
 III. WAS THE OCTOBER 25, 1985 AMENDMENT VALID?
 
 A. Introduction
 
 61
 The plaintiffs have articulated two related theories of liability under ERISA. First, they argue that by unilaterally amending the Plan documents and later distributing the excess funds to itself, both in contravention of the terms of the Plan documents, Murata violated its fiduciary duty to act "in accordance with the documents and instruments governing the plan...." ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) (1988). Second, the plaintiffs contend that because the Plan documents lacked a provision allowing for reversion of the excess assets in the Plans to the employer, Murata contravened ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1) (1988), which provides that "any residual assets of a single-employer plan may be distributed to the employer if ... the plan provides for such a distribution." (emphasis added).
 
 
 62
 The district court found the October 25, 1985 amendment to the Plan documents invalid because the amendment was adopted in contravention of two provisions governing the relationship of the parties: section 57 of the 1984 collective bargaining agreement and section 14.02 of the Plan documents. The court found that the language in section 57 of the collective bargaining agreement stating that "neither the Company nor the Union shall demand any change in the Pension and Welfare Plan" unambiguously prohibited Murata from unilaterally adopting any changes in the Plan documents. Further, the court found that section 14.02's command that "n[o] ... amendment shall vest in the Company any right, title, or interest in or to the funds held by the Trustee" also prohibited the 1985 amendment. Having invalidated the 1985 amendment, the court concluded that there was no other provision in the Plan documents that allowed for reversion of excess funds to Murata. Therefore, the court held that Murata's September 5, 1989 recoupment of the excess funds violated ERISA §§ 404(a)(1)(D) & 4044(d)(1), 29 U.S.C. §§ 1104(a)(1)(D) & 1344(d)(1).[11]
 
 
 63
 We must first determine whether section 57 of the collective bargaining agreement or section 14.02 unambiguously prohibited Murata's 1985 amendment to the Plan documents.
 
 
 64
 B. Section 57 of the Collective Bargaining Agreement
 
 
 65
 Section 57 of the 1984 collective bargaining agreement prevented both the union and Murata from "demand[ing] any change in the Pension and Welfare Plan." Murata contends that this language did not prohibit it from unilaterally amending the Plan documents, but rather only forbade it and the union from demanding changes to the Plans through collective bargaining during the course of the collective bargaining agreement. Murata characterizes section 57 as a standard "zipper clause," which relieves parties of their statutory duty to bargain during the life of a collective bargaining agreement.[12] The plaintiffs respond that if both parties cannot negotiate a change to a collective bargaining agreement during the life of the agreement, then one side cannot amend it unilaterally. Therefore, according to the plaintiffs, the collective bargaining agreement unambiguously prohibits any amendment to the Plan documents during its lifetime.
 
 
 66
 We note at the outset that the parties could have drafted a clearer statement prohibiting all amendments to the Plan documents--that is, section 57 could have stated simply that all amendments to the Plan documents were prohibited during the life of the collective bargaining agreement. Instead, the parties chose to use the phrase "demand any change." This persuades us that the clause might have been inserted, as Murata argues, for the purpose of regulating bargaining, or, as the plaintiffs suggest, for the purpose of regulating amendments to the Plan documents. We believe that the phrase "demand any change," in this context, renders section 57 ambiguous.
 
 
 67
 In addition to the ambiguity in the language of section 57, we note that the background of the provision's adoption suggests that it may have been designed to do something other than prohibit all amendments to the Plan documents. Parties to collective bargaining are obligated to "meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder...." See 29 U.S.C. § 158 (1988); see also First National Maintenance Corp. v. NLRB, 452 U.S. 666, 673-76, 101 S.Ct. 2573, 2578-79, 69 L.Ed.2d 318 (1981). Parties to collective bargaining agreements, however, often waive this statutory duty to bargain in good faith by including a "zipper clause" in their agreement.
 
 
 68
 A zipper clause exempts either all topics not mentioned in the agreement, or certain specified topics, from being subjects of mandatory bargaining during the life of the collective bargaining agreement. See Radioear Corp and International Union of Electrical, Radio and Machine Workers, Local 633, AFL-CIO-CLC, 214 NLRB 362 (1974); see generally Charles Morris, The Developing Labor Law 642 (Bureau of National Affairs, Inc., 1983). As one commentator has explained:
 
 
 69
 The union ... may waive its bargaining entitlement by agreeing to an "entire agreement" or "zipper clause" whereby the parties waive their statutory obligations to bargain over subjects not included in the agreement. Thus, when a union asks to bargain over a subject not contained in the agreement, the employer can refuse on the grounds that the zipper clause waives the union's right to force the employer to bargain over new issues raised during the term of the agreement.
 
 
 70
 Dennis Lynch, Deferral, Waiver, and Arbitration Under the NLRA: From Status to Contract and Back Again, 44 U Miami L Rev 237, 281 (1989).
 
 
 71
 While the plaintiffs' interpretation of section 57 as prohibiting any change to the Plan documents is plausible, the language might also be read as a standard zipper clause, prohibiting either party from attempting to bargain about the Plans during the life of the agreement. If the Plan documents did not otherwise prohibit Murata from unilaterally amending the Plans, Murata could, under the latter construction, enact amendments without obligation to bargain with the union, and the 1985 amendment would not be prohibited by the collective bargaining agreement.
 
 
 72
 For the foregoing reasons, we hold that it was error for the district court to consider the language of section 57 unambiguous. We will therefore reverse the district court's entry of summary judgment in favor of the plaintiffs insofar as it was grounded on the language of section 57. Since section 14.02 does not constitute a ground for upholding the summary judgment either, see infra, we will remand to the district court with instructions to consider extrinsic evidence bearing on the meaning of section 57. This would include, but not necessarily be limited to, evidence concerning the negotiations leading up to the 1984 agreement, and evidence concerning past practices between the union and Murata (and its predecessor corporations) and within the industry with regard to "zipper clauses" and unilateral amendment of plan documents.[13]
 
 B. Section 14.02 of the Plan Documents
 
 73
 The district court also held that the October 25, 1985 amendment was also prohibited by section 14.02 of the 1977 Plan documents, which circumscribed Murata's right to amend the Plan documents by providing that "n[o] ... amendment shall vest in the Company any right, title, or interest in or to the funds held by the Trustee." Murata contends that the phrase "funds held by the Trustee" refers only to those monies in the plan necessary to satisfy liabilities to the Plans' participants. Therefore, Murata argues, section 14.02 did not prohibit an amendment allowing it to recoup any residual assets remaining after satisfaction of all liabilities.
 
 
 74
 To support its argument, Murata relies on two cases with similar fact patterns. In Wilson v. Bluefield Supply Co., 819 F.2d 457 (4th Cir.1987), the court considered the validity of an amendment to a defined benefits plan that allowed the employer to recoup the excess funds remaining in the Plan upon termination. At the time of the Plan's creation the Plan documents contained a provision that read:
 
 
 75
 No part of the Fund or interest therein nor any item of property included therein shall be withdrawn, assigned or otherwise transferred in whole or in part, either by the voluntary act of the Company or by operation of law or otherwise.... None of the assets belonging to the Fund hereby created, or of the income therefrom, shall be diverted or used for any purpose other than the exclusive benefit of the Participants as contemplated and provided by this agreement.
 
 
 76
 Id. at 461. The employer amended the Plan documents to allow for reversion of excess funds to itself upon termination and subsequently terminated the plan. Participants in the Plan brought suit, alleging that the amendment allowing for reversion was impermissible under this provision of the Plan. The district court, however, granted summary judgment in favor of the company.
 
 
 77
 The Fourth Circuit affirmed. The court noted that the phrase limited the company's right only to "assets belonging to the Fund." Because the Plan elsewhere defined "fund" as the monies necessary "for the uses and purposes herein provided," the court concluded that "fund" meant only those assets " 'as were necessary to insure full payment of the plan's obligations to the participants.' " See id. at 464 (quoting In re C.D. Moyer Company Trust Fund, 441 F.Supp. 1128, 1132 (E.D.Pa.1977)). The court concluded that, under the terms of the Plan, there was a distinction between the assets necessary to satisfy debts owed to plan participants and residual assets remaining after such debts had been satisfied. The court held that, while the company had no title to any of the assets in the former category, it had the right to recoup those assets in the latter category remaining upon termination, and that the company breached no fiduciary duty by amending the Plan to allow such recoupment.
 
 
 78
 In In re C.D. Moyer Company Trust Fund, 441 F.Supp. 1128, 1131 (E.D.Pa.1977), aff'd without op., In re C.D. Moyer Co. Pension Trust, 582 F.2d 1273, aff'd without op., Appeal of Pension Ben. Guaranty Corp., 582 F.2d 1275 (3d Cir.1978), which also involved a defined benefits plan, the original Plan documents contained a similar provision limiting the employer's right to recoup monies in the Plan:
 
 
 79
 It shall, however, at all times be impossible, if any alteration, amendment, or revocation be made pursuant to this provision, for any of the trust corpus or income to be diverted to or revert to either of the employers or to be used for any purpose other than the exclusive benefit of the participants or their beneficiaries.
 
 
 80
 The court nevertheless permitted an amendment allowing the residual assets to revert to the employer upon termination of the plan. Because the Plan was for the purpose of providing "such sums as may be necessary to pay for and to finance the benefits under the Plan," the court concluded that the phrase "trust corpus or income" referred only to those funds necessary to satisfy the Plan's liabilities. Therefore, the court held that the company was free to impose an amendment allowing for the reversion to itself of excess funds remaining upon termination of the Plan. Murata contends that the logic that controlled in Wilson and Moyer should apply here as well.
 
 
 81
 This court has twice confronted the question of what type of language may prohibit amendment to plan documents to allow for reversion of excess funds to the sponsoring employer. In DelGrosso v. Spang and Co., 769 F.2d 928 (3d Cir.1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986), we considered whether an employer could amend a defined contribution plan to allow for reversion of excess residual assets to itself. However, the Plan documents explicitly prohibited the employer from amending the Plan unilaterally and specifically provided that "[t]he contributions made by the Company hereunder may not, under any circumstances, revert to the Company," 769 F.2d at 935. Therefore, we found it a breach of fiduciary duty for the employer to have amended the Plan to allow for reversion of excess funds to itself.
 
 
 82
 In addition, we noted in DelGrosso that unlike under a defined benefits plan, the employer's donations to the defined contribution plan were made out of the employees' compensation in specific amounts required in the plan. See 769 F.2d at 935. Therefore, our decision that the Plan prohibited reversion did not implicate the policy concern that employers may be encouraged to underfund defined benefits plans for fear of losing any surplus.
 
 
 83
 Two years later, in Chait v. Bernstein, 835 F.2d 1017 (3d Cir.1987), we were faced with a fact pattern more analogous to the one present here. There, the employer amended a defined benefits plan to allow for reversion to itself of any excess funds remaining in the Plan upon termination. When the Plan was terminated, a participant brought suit, alleging that the Plan documents prohibited amendment to allow reversion of excess funds to the employer. The Plan documents provided that "no ... amendment shall authorize or permit any part of the funds held under the Plan to be used for or diverted to purposes other than for the exclusive benefit of the Employees." Id. at 1022. We concluded that "the inclusion of the 'exclusive benefit' language, standing alone, cannot be read to indicate that the Plan prohibited surplus reversion to the employer." Id. at 1023. As we read the Plan documents, they contained only the standard language requiring that the plans be for the benefit of employees, but did not contain a sufficiently specific prohibition of reversion of excess assets to the employer. We also emphasized the strong policy concern in favor of allowing reversion to the employer of excess assets in a defined benefits plan so that employers are not encouraged to underfund such plans. See id. at 1027.
 
 
 84
 We must decide here whether the language in the Plan documents differs sufficiently from the language in the plan in Chait as to justify prohibiting an amendment to allow reversion of excess funds to Murata. We note at the outset that the language here is more specific. As opposed to a general statement that the money in the Plans is to be used for the benefit of employees, section 14.02 states that "n[o] ... amendment shall vest in the Company any right, title, or interest in or to the funds held by the Trustee." The language here specifically contemplates a limitation on the power of the Company to amend the Plans and is more than the boilerplate statement in Chait that the funds in the plan were for the exclusive benefit of the employees.
 
 
 85
 Nevertheless, we conclude that section 14.02 did not prohibit Murata's amending the Plans to allow it to recoup excess funds. The limitation on amendments only stated that the company could not amend the Plans to allow it to have an interest in "funds held by the Trustee." "Fund" is defined in section 1.05 of the Plan documents as "the Trust Fund held pursuant to the Agreement," while "the Agreement" is defined as "the Agreement ... to be used for funding benefits under the Plan." Hence, "funds held by the Trustee" refers only to those funds necessary for funding benefits under the Plans and not to money remaining once all benefits have been paid out. Not only is this the definition of "funds" provided in these particular Plans, but it is also the meaning given to "funds" by courts in similar contexts. See Wilson, 819 F.2d at 463-65; Moyer, 441 F.Supp. at 1131-32.
 
 
 86
 Additionally, we note that in construing the language of the Plans we are influenced by the fact that the Plans at issue here are defined benefits plans, to which the employees did not individually contribute, but which depended upon Murata and its predecessor corporations to fund sufficiently. Because of the strong policy concern that employers not be encouraged to underfund defined benefits plans, see Chait, 835 F.2d at 1027, the language purporting to prohibit amendment to plan documents to allow for reversion of excess funds in a defined benefits plan must be quite explicit.
 
 
 87
 We find that the language in section 14.02, when read in conjunction with other provisions of the Plan documents, prohibits only amendments that would allow Murata to recoup funds necessary to provide benefits guaranteed under the Plans. We therefore hold that the district court erred in finding that section 14.02 prohibited Murata's adoption of the October 25, 1985 amendment. Given this conclusion (and our conclusion in the preceding section), the judgment must be reversed, and the case remanded for further proceedings. Although, on remand, the court may determine that the collective bargaining agreement forbade the 1985 amendment, we hold that section 14.02 of the Plan documents did not.[14]
 
 
 88
 IV. WAS REVERSION AUTHORIZED BY THE PLAN DOCUMENTS PRIOR TO
 
 
 89
 THE OCTOBER 25, 1985 AMENDMENT?
 
 A. Introduction
 
 90
 Murata argues that even if the October 25, 1985 amendment was invalid, the Company is nevertheless entitled to summary judgment because the Plan documents, as they existed prior to that date, permitted reversion to the Company of the excess funds remaining upon termination. We therefore must reach this question.
 
 
 91
 The underlying basis for Murata's argument is that from 1955 until 1985, the Plan documents included a provision allowing for reversion of excess funds to the Company upon termination. That provision, which was contained in section 13.04(D), provided:
 
 
 92
 [T]he net assets after provision is made for administrative expenses and expenses of liquidation, shall be applied to payment of benefits in the following order:
 
 
 93
 ....
 
 
 94
 (6) By distributing to the Company any excess remaining in the Fund due to erroneous actuarial computation as defined in Treasury Regulations.
 
 
 95
 Murata contends that any excess remaining in the fund once all liabilities have been satisfied is an excess due to erroneous actuarial computation and, therefore, may revert to the Company under this provision.
 
 
 96
 Murata acknowledges that this provision allowing reversion to the company of excess funds due to erroneous actuarial computation was excluded from the Plans when they were restated in 1977, but argues that such omission was the result of a scrivener's error rather than intentional exclusion.[15] Murata therefore requests that we treat the "erroneous actuarial computation" clause as if it were contained in the Plan documents at the time that Murata amended them in 1985, and further urges that the clause allowed for the reversion that subsequently occurred in 1989. The district court apparently disregarded Murata's argument on this issue.
 
 B. Scrivener's Error
 
 97
 We must initially decide whether importing the equitable doctrine of reformation of contract due to a scrivener's error into the ERISA context is consistent with the purposes of ERISA. Under the doctrine of scrivener's error, the mistake of a scrivener in drafting a document may be reformed based upon parol evidence, provided the evidence is "clear, precise, convincing and of the most satisfactory character" that a mistake has occurred and that the mistake does not reflect the intent of the parties. See In re Estate of Duncan, 426 Pa. 283, 232 A.2d 717, 720 (1967). See also Beck v. Pennsylvania Nat'l Mutual Casualty Ins. Co., 429 F.2d 813, 817 (5th Cir.1970); Easton v. Washington County Ins. Co., 391 Pa. 28, 137 A.2d 332, 337 (1957).
 
 
 98
 As we have previously noted in a different context, one statutory goal of ERISA is to insure that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." See Frank v. Colt Indus., Inc., 910 F.2d 90, 97 (3d Cir.1990). Allowing the doctrine of scrivener's error to apply in ERISA cases would seem at odds with this statutory purpose. A plan document containing a scrivener's error might mislead an employee into believing he had rights or obligations that he did not, in fact, have. If, on the other hand, the employer were bound by the plan documents, whether or not they contained errors, the employee would know precisely his obligations and rights upon reading the plans.
 
 
 99
 Despite this potential tension with a statutory purpose of ERISA, we believe that the scrivener's error doctrine is appropriate in this particular case. Here, the alleged error relates to what is admittedly a "windfall" for either Murata or the plaintiffs--an excess remaining in the Plans that neither side could have reasonably expected. The plaintiffs' reasonable reliance on the 1977 Plan documents would probably not have led them to believe that there would be any excess funds remaining upon termination. Nor is it likely that reading the Plan documents would have led participants to believe that if any excess funds remained after termination, that excess would be distributed to them. ERISA's goal of providing clear Plan documents is, therefore, less pertinent in this situation, and we believe that application of the scrivener's error doctrine is appropriate.
 
 
 100
 We also believe that there are genuine issues of material fact with regard to the scrivener's error issue. We note in this regard that Murata presented evidence that the parties intended to include the erroneous actuarial computation provision in the 1977 restatement of the Plan documents. Specifically, Murata submitted the affidavit of a company official, Raymond Bertone, who had been employed by Murata and its predecessors since 1950. Bertone stated that "[w]hen the Company adopted the changes in the 1977 and 1978 restatements to the Plans it was attempting only to comply with the language requirements of ERISA.... The Company was not consciously changing its right to the reversion when it adopted the 1977 and 1978 versions of the plan documents...."We acknowledge, as the plaintiffs have urged, that this is self-serving testimony that might be determined to lack credibility. Further, the history of collective bargaining negotiations in 1984 may suggest that Murata did not, in fact, believe at that time that it had the right to recoup excess funds remaining in the Plans upon termination. Indeed, the evidence may be insufficient to meet the rigorous test for establishing a scrivener's error, given the clear and convincing standard of proof. See Estate of Duncan, 232 A.2d at 720. Nevertheless, we believe that the Bertone affidavit creates a genuine issue of material fact, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and that the district court, if it concludes that the October 25, 1985 amendment was invalid, must resolve this dispute. The court will then have to determine whether the parties intended something other than what was written in the 1977 Plan documents and whether equity requires that the ERISA Plans be reformed consistent with that actual intent.
 
 
 101
 C. Meaning of Erroneous Actuarial Computation
 
 
 102
 If the district court on remand finds that the 1985 amendment was invalid, but that the 1977 Plan documents should be reformed due to a scrivener's error to include the reversion provision of section 13.04(D)(6), the court will then have to construe the meaning of the language "erroneous actuarial computation" in that provision. Specifically, the court will need to determine whether section 13.04(D)(6) gives the Company a general right of reversion for excess funds remaining in the Plans upon termination. It may be necessary for the district court to receive additional evidence on this point.
 
 V. CONCLUSION
 
 103
 For the foregoing reasons, the judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion. The district court must initially determine whether the collective bargaining agreement prohibited the October 25, 1985 amendment. If it did not, then Murata is entitled to summary judgment. If the amendment was prohibited, the district court must determine, consistent with our instructions in this opinion, whether any other provision of the Plan documents permitted reversion of excess funds to the employer upon termination.
 
 
 
 [1]
 The plaintiffs also brought a breach of contract claim under section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185 (1988), alleging that Murata had breached its collective bargaining agreement with the union by amending the Plan documents when the collective bargaining agreement prohibited amendments. The LMRA claim is factually coextensive with the plaintiffs' claim under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), that the 1985 amendment was in contravention of the Plan documents, including the collective bargaining agreement. Because the district court granted summary judgment to the plaintiffs on their ERISA claims, it treated the LMRA claim as moot and did not pass on it. We therefore do not consider it on this appeal. The district court, however, may reach the LMRA claim on remand
 
 
 [2]
 A defined benefit plan differs from a defined contribution plan, "which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account...." ERISA § 3(34), 29 U.S.C. § 1002(34) (1988). See also Chait v. Bernstein, 835 F.2d 1017, 1019 n. 1 (3d Cir.1987)
 
 
 [3]
 The 1977 amendments also included some renumbering so that section 13.04(D) became section 13.04(B)
 
 
 [4]
 The district court did not rule on Murata's LMRA statute of limitations argument because it treated the plaintiffs' LMRA claim as moot. See note 1
 
 
 [5]
 ERISA § 413, 29 U.S.C. § 1113 (1988), provides:
 No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
 (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
 (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
 except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.
 
 
 [6]
 The plaintiffs contend that Murata did not raise before the district court the argument that the plaintiffs received actual notice of the amendment more than three years before they filed suit, and that, the issue not having been properly preserved, it cannot now be raised on appeal. We disagree. In its "Brief in Support of Defendant's Cross-Motion for Summary Judgment," Murata argued that plaintiffs "were formally notified of changes to the trust documents [and] it is undisputable that notice clearly was provided before October 28, 1985." We conclude that this was sufficient to raise the issue before the district court. This conclusion is bolstered by the fact that the district court treated the actual notice argument under ERISA § 413, 29 U.S.C. § 1113, as if it had been raised and, although it rejected the argument, discussed it in its written opinion
 
 
 [7]
 Murata also argues that the plaintiffs had constructive notice of the breach and that such constructive notice was sufficient to allow the statute of limitations to begin to run. Murata relies on the former version of ERISA § 413, 29 U.S.C. § 1113, which was amended in 1987. The former § 1113 provided that the right to bring suit would expire
 three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this title....
 (emphasis added). The former subsection (B) was deleted from the statute in 1987. See Pub. L. No. 100-203, Title IX § 9342(b), 101 Stat 1330-371 (December 22, 1987).
 Murata argues, without citation to the record, that it filed a report concerning the 1985 amendments with the Secretary of the Treasury in 1985 and that this should have given plaintiffs notice of the amendment. According to Murata, because the 1985 amendment is the basis for plaintiffs' claim of breach of fiduciary duty, and because a report was filed from which plaintiffs might reasonably have been expected to know of the violation, the statute of limitations bars plaintiffs' claim.
 We disagree. First, Murata did not raise this argument in the district court or in its opening brief on appeal, thereby foreclosing us from considering it. See McLendon v. Continental Can Co., 908 F.2d 1171, 1183 (3d Cir.1990) (holding, in ERISA context, that when an argument is not raised until a reply brief on appeal, the argument is waived); Hoxworth v. Blinder, Robinson & Co. 903 F.2d 186, 205, 205 n. 29 (3d Cir.1990). At all events, Murata has presented insufficient evidence that there was in fact such a report filed or that plaintiffs "could reasonably be expected to have obtained knowledge of such breach or violation" from that report.
 
 
 [8]
 Murata does not argue that the plaintiffs' recoupment claim under ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1), is time-barred. We note, however, that because the actual reversion took place only three months before the suit was filed, that claim presents no statute of limitations problems
 
 
 [9]
 We also note that, in contrast to Gluck where the district court had granted the defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(6), the district court here has proceeded on a fuller record, ruling on a motion for summary judgment. We therefore need not remand, as we did in Gluck, for further fact-finding on the issue of when the plaintiffs acquired actual knowledge
 
 
 [10]
 The plaintiffs also assert that Murata engaged in "fraud or concealment" of its breach within the meaning of ERISA § 413, 29 U.S.C. § 1113, thereby tolling the statute of limitations. Because we hold that the plaintiffs did not have actual knowledge of the breach more than three years before filing suit, we need not reach this argument
 
 
 [11]
 As we explain in note 1, the district court treated the plaintiffs' LMRA breach of contract claim as moot
 
 
 [12]
 The plaintiffs contend that Murata waived the argument that section 57 is a zipper clause by not raising it in the district court. We disagree. Although Murata did not make the argument in the detail that it does upon appeal and did not mention the term "zipper clause," it is clear from Murata's recitation of the facts in its "Brief in Opposition to Plaintiffs' Motion for Summary Judgment" that its position was that section 57 did not preclude adoption of the amendment but was a standard zipper clause. We believe that this was sufficient to preserve the issue for appeal
 
 
 [13]
 Murata presented evidence in the district court related to both the 1984 negotiations and to the past practice of unilateral amendment by the employer when the collective bargaining agreement contained a clause similar to section 57, but the district court declined to consider this evidence. Because we disagree with the district court's ruling that section 57 is unambiguous, the court must now consider this evidence in the first instance. After reviewing the evidence, the court may decide that there still remains no genuine issue of material fact as to the meaning of section 57 and enter summary judgment in favor of one of the parties. If a genuine issue exists, however, the court will have to proceed to trial
 
 
 [14]
 Murata also contends, citing our decision in Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155 (3d Cir.1990), that even if its actions were inconsistent with the terms of the Plan documents, it was not acting as a fiduciary when it amended the Plans and therefore cannot be held liable for a breach of fiduciary duty under ERISA § 404, 29 U.S.C. § 1104 (1988). However, in its answer to the plaintiffs' complaint in the district court, Murata specifically admitted that it was acting as a fiduciary. Therefore, the argument was waived in the district court and cannot now be raised on appeal
 
 
 [15]
 Murata's argument that Pennsylvania trust law, rather than ERISA § 4044, 29 U.S.C. § 1344, should control our disposition of this issue is without merit. Pennsylvania trust law is clearly preempted in this instance by ERISA's supersedure clause. See ERISA § 514(a), 29 U.S.C. § 1144(a) (1988)